675 P.2d 1353

**STATE of Arizona, Appellee,**

v.

**Allan Harold JUST, Appellant.**

**No. 1 CA–CR 5560.**

Court of Appeals of Arizona,
Division 1, Department A.

Oct. 11, 1983.

Reconsideration Denied Nov. 16, 1983.

Review Denied Jan. 17, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Crim. Div., Crane McClennen, David R. Cole, Asst. Attys. Gen., Phoenix, for appellee.

Shultz, Worischeck & Shapiro, P.C. by Myron Shapiro, and Ross P. Lee, Maricopa County Public Defender by Michael G. Sullivan, Deputy Public Defender, Phoenix, for appellant.

1. A.R.S. §§ 13–1104, 13–1101 and 13–604.

## OPINION

CORCORAN, Judge.

Appellant brings this appeal from his conviction of second degree murder, a class 2 dangerous felony,[1] following a trial by jury, and his aggravated sentence of 15 years. He raises eight issues for this court's consideration: 1) Whether the trial court erred in denying his motion for a redetermination of probable cause; 2) whether the trial court erred in not ruling that appellant had an additional peremptory jury challenge; 3) whether the trial court improperly admitted hearsay testimony of statements of the daughter of appellant to an investigating officer; 4) whether the trial court erred in denying appellant's motions for a directed verdict of acquittal pursuant to rule 20, Arizona Rules of Criminal Procedure; 5) whether the trial court erred in denying appellant's request to sequester the jury; 6) whether the trial court erred in instructing the jury on the elements of first degree murder; 7) whether appellant was denied due process at the time of closing arguments; and 8) whether the trial court improperly aggravated appellant's sentence.

The charge in this case arose out of the death of appellant's wife, Sharon Ruth Just, on July 21, 1980. The evidence, viewed in a light most favorable to sustaining the verdict, reveals that during the early morning hours of July 21, 1980, Jana Just, the nine-year-old daughter of appellant and the victim was awakened by the sound of her brother crying. While she was awake, she heard her mother scream from the bedroom, "Al" and "Al, stop it." Jana approached her parents' bedroom, and turned on the light, but was unable to observe her parents because her view was obstructed by the door. Appellant told Jana to turn off the light and go to bed. Jana returned to bed. Jana heard her father take a shower, and after he took a shower, he got the children out of bed, told them that there had been an accident and that their mother had rolled out of bed onto

a knife. He told them that he had pulled the knife from her and put his hand over her mouth so that her screams would not wake them.

Appellant then called his minister, Pastor William Meyer, and told him there had been an accident. Meyer told appellant to telephone the police department. Leasha Ratliff, a Crime Stop operator, testified that she answered the call and notified the fire department and the police dispatcher. The tape recording of appellant's telephone call to the police department was played for the jury. Ratliff noted during the phone conversation that appellant sounded "crazy" and "incoherent." Betty Kipp, who was the dispatcher for the fire department, and who was on the line during the conversation between appellant and Ratliff, testified that appellant sounded "very calm and very strange."

The Phoenix Fire Department dispatched paramedics to appellant's residence at approximately 4:10 a.m. They arrived three to four minutes later. Appellant met Paramedic James Clifford at the door. Clifford was followed by Pastor Meyer. As the two parties reached the door, appellant said the words, "they really did it this time." Clifford entered the master bedroom and saw the unclad body of Sharon Just lying on her right side on the bed with her head at the foot of the bed. Clifford observed blood on the floor near the bed, and observed the body had very little blood on it. Appellant told Clifford that his wife had fallen on a knife. Clifford observed a broken knife between the sink and the wall in the bathroom. He also saw blood on the shower floor. Clifford was unable to get a response from Sharon Just.

Phoenix Police Department Detective Harry Jennings also arrived at the residence in the early morning hours of July 21, 1980. He testified that the bedroom was in disarray when he arrived. He discovered the broken knife, several towels and pillow cases with bloodstains in the bathroom. The pillow cases had been washed. He determined that there was no evidence that anyone had forced entry into the residence.

The Chief Investigating Officer, Phoenix Police Department Detective George Klettlinger interviewed appellant at approximately 6:45 a.m. July 21, 1980, following appellant's arrest. He advised appellant of his constitutional rights. Appellant told Klettlinger in a rambling interview that he and his wife had put their four children to bed between 8:30 and 9:00 p.m. the evening of July 20, 1980. As was their custom when the children ate dinner earlier in the evening, he and his wife had dinner in their bedroom that evening. Appellant cooked steaks, and they moved an extra table from the living room into the bedroom on which to have dinner. They watched television, and went swimming. At one point during the evening, their son Robbie began to cry, so appellant placed him on the floor in their bedroom until he became quiet. Appellant then put him back into his bedroom. At another point during the evening appellant and his wife made love, which appellant indicated to Klettlinger was a "beautiful" experience. After dinner, appellant and his wife discussed what to have for dessert and remembered there was some zucchini bread in the refrigerator. Appellant got the zucchini bread, a knife, and a cutting board and brought it to the bedroom. He stated that he ate most of the zucchini bread. He placed the knife and bread pan on a chair. Appellant and his wife dozed off, and appellant later woke up and went to the kitchen.

Appellant told Klettlinger that while he was in the kitchen he heard his wife screaming, and he ran into the bedroom. He stated that he observed her lying on the floor next to the bed, and that he attempted to lift her body. As he did so, he dropped her and discovered the knife, and removed it. He told Klettlinger that she was struggling with him, that he reached in her mouth to keep her from swallowing her tongue, and that when he did so, she bit his thumb. He took pillows and sheets and pressed them between himself and Sharon in an effort to stop the bleeding. He also stated that he put his hands over

her mouth so that her screams would not wake the children. He told Klettlinger that when Jana entered the bedroom and turned the light on, he told her to turn off the light and go back to bed. After Sharon went limp, appellant washed her body, and took a shower. He told Klettlinger that she did not commit suicide and could not have been killed by an intruder. Appellant stated that he assumed that she had rolled off the bed and sustained the knife wound.

Heinz H. Karnitschnig, M.D., Chief Medical Examiner for Maricopa County, performed an autopsy on the victim and testified that the cause of death was a single stab wound which punctured the victim's left lung, pulmonary artery and pulmonary vein. The wound was approximately four inches deep, and there were indications that the knife was twisted after it entered the body. He stated that the knife fractured one of her ribs, indicating that some force was used in the stabbing. He testified about the other injuries which appeared on her face, hands, and left arm. Finally, he stated that while her death was probably not instantaneous, it would have been extremely difficult to save her even if she could have been operated on within four minutes of the stabbing.

In excess of 20 witnesses testified on behalf of appellant. Many of the witnesses had known appellant and his wife when they had lived in Minnesota and Wisconsin before moving to Phoenix. The majority of witnesses testified that they never observed appellant and his wife argue or fight, they had an ideal and affectionate marriage, that they had a special relationship with their children, that they always participated in activities as a family, and had an extremely loving home life. The witnesses testified to appellant's religious upbringing and close association with his church; indeed, appellant was a "teaching minister" for the Lutheran Church. They testified about appellant's contributions to their own children and the children of others as a coach and a math teacher. Numerous witnesses stated that they were sufficiently close to either appellant or his wife to have known if there were problems in appellant's marriage. None of the witnesses knew of any such problems. Most of the witnesses knew nothing about the details of the offense because appellant had been instructed by his attorneys not to speak about them.

Appellant testified in his own behalf at trial. His testimony concerning the events of the evening of July 20, 1980, and early morning hours of July 21, 1980, was substantially similar to the statement he had given Detective Klettlinger. He testified that he had gone into the kitchen after he had awakened to get some juice or water or milk to drink, that he removed two gallon containers from the refrigerator and placed them on the cabinet. At that point he heard Sharon scream and entered the bedroom. He testified that he continued to tell her that people would be coming to help, but did not realize that he had not called anyone to help. He believed that the marks and scratches on her body, and those on his body were caused in the struggle between them. He stated that after he called Crime Stop, he noticed the bottles on the kitchen counter, and placed them back in the refrigerator, and that was why the investigative photographs of the kitchen area did not show the containers on the kitchen counter. He testified that when his daughter Jana had asked him after he had awakened the children about a fight between himself and the victim, he told Jana, "there was no fight."

After the defense rested its case, the parties stipulated that the appellant's delay in seeking medical assistance did not cause the death of Sharon Just. The trial court instructed the jury on the elements of first degree murder and second degree murder. The jury returned its verdict finding appellant guilty of second degree murder. Following a presentence hearing, the trial court found both aggravating and mitigating circumstances, but found that the aggravating circumstances were sufficiently substantial to require the imposition of an enhanced sentence, and accordingly sentenced the appellant to serve an aggravated term of 15 years, with the recommenda-

tion that the sentence be served in Minnesota.

## GRAND JURY PROCEEDINGS

Appellant raises several claims of error arising from the grand jury proceedings. Appellant was indicted twice for first degree murder. The first indictment was remanded following appellant's motion for a redetermination of probable cause because the trial court found that the County Attorney had improperly instructed the grand jury.

Following the remand, appellant submitted a letter to the grand jury requesting the jurors to consider evidence in appellant's behalf as "a person under investigation" pursuant to A.R.S. § 21–412. The letter requested the jury to hear tape recorded interviews of appellant's relatives, friends in Minnesota, all conducted in the presence of County Attorney Investigator Martinson and Defense Investigator Pennington. The letter also requested the grand jury to hear tape recorded interviews conducted by Pennington of Arizona neighbors and friends. The prosecutor filed a motion *in limine* seeking to preclude the presentation of the proffered evidence to the grand jury. Judge Robert C. Broomfield ruled that the matter was to be determined by the grand jury, and if the grand jury decided it wanted to hear the tape, the appellant would be required to give a copy to the County Attorney, and the County Attorney would be required to present it to the grand jury. The trial court also recommended that the prosecutor communicate with defense attorneys so that they could be available with Pennington upon a request to hear the tapes.

On November 13, 1980, one week after the hearing on the motion *in limine*, the

grand jury convened and heard some of the state's evidence in support of the indictment. At the conclusion of the testimony of one of the state's witnesses, Deputy County Attorney Miles Nelson spoke to the grand jury as follows:

Ladies and gentlemen, we don't have any additional evidence to present at this time. However, you do have a letter requesting that certain evidence be presented to the grand jury.

At this point, there are certain options available to you:

You can request that that evidence be presented to you.

Or [sic] additional option would be that you can have the evidence which is requested be presented in a summary form. And this could be accomplished by one of the County Attorney's investigators who would be available and prepared to summarize that requested evidence.

Or an additional option would be to simply decide not to have any of that evidence presented to you.

This is a decision that you will have to make as the entire grand jury.

The grand jury requested that the investigator for the County Attorney's office appear and summarize the proffered defense evidence.

Appellant contends that the prosecutor misadvised the grand jury pursuant to A.R.S. § 21–412.[2] Appellant argues that the statute gives the grand jury the discretion only to either grant or deny the request from the defendant. He concludes that the prosecutor's advice to the grand jury that they had a third option of hearing the County Attorney's investigator summarize the defense evidence "destroyed defendant's substantial procedural right to have the grand jury make an independent

---

**2.** A.R.S. § 21–412 provides in pertinent part: The grand jurors are under no duty to hear evidence at the request of the person under investigation but may do so. The person under investigation shall have the right to advice of counsel during the giving of any testimony by him before the grand jury, provided that such counsel may not communicate with anyone other than his client.

\* \* \* \* \* \*

The grand jurors shall weigh all the evidence received by them and when they have reasonable ground to believe that other evidence, which is available, will explain away the contemplated charge, they may require the evidence to be produced.

and uninfluenced decision about the defendant's request." Appellant also argues that the investigator improperly summarized the proffered defense evidence and that he misled the grand jury into believing that the children of the appellant had essentially been "prepped" as witnesses by the defense investigator before he, the state's investigator, interviewed them.

For his additional claims of error arising from the grand jury proceedings appellant argues that his clergyman privilege was violated before the grand jury when the county attorney questioned Klettlinger regarding statements made by appellant to Pastor Meyer immediately following the death of the victim and then invoked the clergyman privilege when Pastor Meyer appeared before the grand jury and was asked about the same conversations. Finally, appellant contends that the grand jury was incorrectly instructed on the elements of first degree murder when the prosecutor read to the grand jury the definition of murder from the prior criminal code, and thus instructed the grand jury on the culpable mental state of "knowingly," but did not instruct the jury on the culpable mental state of "intentionally." He contends this error was compounded because the prosecutor also instructed the jury on the elements of felony murder.

The grand jury did request to hear testimony of Pennington, Pastor Meyer, and Doctor Karnitschnig. Following their testimony on November 18, 1980, the grand jury returned the indictment charging appellant with first degree murder. Thereafter, appellant filed a motion for a redetermination of probable cause in the trial court. The trial court determined that the statements made by the state's witness, Martinson, concerning his interview of the children of appellant were improper, but that in light of all the evidence presented to the grand jury and the manner in which the evidence was presented, the appellant was not denied a substantial procedural right because of the statements. As to appellant's other claims of impropriety in the grand jury proceedings, the trial court likewise found that appellant was not denied a

substantial procedural right, and denied the motion for redetermination of probable cause. Following the denial of the motion for rehearing, appellant filed a petition for special action in the supreme court. The supreme court declined to take review of the petition by a vote of 3 to 2.

Before we address the issue of whether appellant has preserved the alleged irregularities in the grand jury proceedings for review on appeal, we find it necessary to address Deputy County Attorney Vince Imbordino's violation of both A.R.S. § 21–412 and Judge Broomfield's order requiring him to present appellant's proffered tape recording to the grand jury upon the request of the grand jury.

█ Appellant is correct when he argues that A.R.S. § 21–412 gives the grand jury only two options upon a request that the grand jury receive evidence from the person under investigation. The grand jury may either grant or deny the request. The statute does not authorize the prosecutor to present a third option of summarizing the defense evidence from his own point of view. The purpose of the statute is obviously to give the grand jury the opportunity to hear the evidence it deems necessary to make its probable cause determination. The statute is clear. However, even if there had been any confusion on the part of Mr. Imbordino as to the proper interpretation of the statute, that confusion was surely dispelled by Judge Broomfield's order directing him to make the tape offered by appellant available to the grand jurors on their request.

We find, however, that the prosecutor's violation of the statute and Judge Broomfield's order is not reversible error in this case. In *United States v. Basurto*, 497 F.2d 781 (9th Cir.1974), the court found reversible error in the prosecutor's failure to inform the court that he had presented perjured testimony to the grand jury upon his discovery of the perjury. Basing its decision on the Due Process Clause of the Fifth Amendment and *Mesarosh v. United*

*States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), the court of appeals wrote:

> We hold that the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury—in order that appropriate action may be taken.

497 F.2d at 785–86. In the instant case, there is no evidence that the prosecutor used testimony he knew or later learned to be perjured in obtaining the indictment. Hence, we find no due process violation in the grand jury proceedings. Further, we have reviewed the remaining evidence presented to the grand jury and find it to be more than sufficient to support the determination of probable cause.

The next question before this court is whether the alleged irregularities in the grand jury proceedings constitute reversible error which may be raised by appeal following a conviction. Appellant contends that he has preserved the matter for review by this court by filing the petition for special action. The state argues that our holding in *State v. Verive,* 128 Ariz. 570, 627 P.2d 721 (App.1981) precludes a finding by this court that the alleged irregularities constitute reversible error at this stage of the proceedings.

In *State v. Neese,* 126 Ariz. 499, 616 P.2d 959 (App.1980), this court held that the trial court's ruling denying appellant's motion for a redetermination of probable cause, even though erroneous, did not constitute reversible error following a trial where the jury had determined guilt beyond a reasonable doubt. Neese had not filed a petition for special action from the trial court's denial of the motion for redetermination of probable cause. The record revealed that there were off the record discussions dur-

ing the grand jury proceedings between one of the grand jurors and a witness. We noted that *Wilkey v. Superior Court,* 115 Ariz. 526, 566 P.2d 327 (App.1977) had held that all proceedings before the grand jury, with the exception of the jury's deliberations, were to be recorded, and that the failure to record required that the appellate court grant relief on a petition for special action. In *Neese,* however, the court noted that the appellant had been tried and convicted by a jury for conspiracy to violate marijuana laws. The court reasoned that following such a conviction, the entire judicial process should not be started over again. The court observed that the purpose of a grand jury proceeding is to determine whether there is probable cause to believe that the individual committed an offense, and that, "[p]rior to trial the question of whether probable cause exists is an open one, however, after a full scale trial in which a jury determines guilt beyond a reasonable doubt the question is closed." 126 Ariz. at 502–03, 616 P.2d at 962–63.

We followed *Neese* in *State v. Verive, supra,* where the appellant claimed that the prosecutor withheld exculpatory material from a grand jury. We noted therein that the trial jury had been presented the evidence of the exculpatory matters, and had found the defendant guilty beyond a reasonable doubt. We concluded that a "defendant cannot, by appeal from a conviction, obtain review of matters relevant only to the grand jury proceedings that had no effect on the subsequent trial." 128 Ariz. at 575, 627 P.2d at 726.

The reasoning of *Neese* and *Verive* is compelling in this case. Appellant appears to contend that because he filed a petition for special action, he has preserved the issue of irregularity in the grand jury proceedings for review on appeal. However, the logic of the holdings in *Neese* and *Verive* do not lend support to appellant's position. The holdings in those cases were based on the observation that once a trial jury has found guilt beyond a reasonable doubt following a proper presentation of both the state's and the defendant's evi-

dence, the issue of probable cause to believe the defendant has committed an offense is no longer open to question. The evidence presented at trial further supports this conclusion. Neither Martinson nor Pennington testified at trial, and thus, no evidence was presented to the trial jury implying that appellant's children were prepared by a defense investigator prior to answering questions by the state's investigator. Pastor Meyer testified fully at trial without the invocation of the clergyman's privilege.

The appellant correctly sought redress of the trial court's refusal to remand the case to the grand jury by special action. When the supreme court declined jurisdiction he had exhausted his remedy on this issue. Appellant cannot, by appeal from a conviction, obtain review of those matters. *State v. Verive, supra.*

## ADDITIONAL PEREMPTORY JURY CHALLENGES

■ Appellant contends that he was entitled to an additional peremptory jury challenge because two alternate jurors were added to the jury panel. He asserts that rule 47(f), Arizona Rules of Civil Procedure, provides a system for challenges in the event alternate jurors are called, and that since such a procedure is absent from criminal rule 18.4(c), the Rules of Civil Procedure should have been followed. Rule 18.4(c)(1)(i), Arizona Rules of Criminal Procedure, provides that the defendant shall be allowed ten peremptory challenges if the offense charged is punishable by death. Rule 18.2 provides:

The court may in its discretion qualify such additional jurors as it deems necessary. All jurors shall be deemed regular jurors until alternates are designated pursuant to Rule 18.5(h).

The comment to rule 18.2 notes that there is no distinction between alternate and regular jurors. Rule 18.5(g) provides:

Exercise of Peremptory Challenges. Following examination of the jurors, the prosecutor shall exercise his peremptory challenges on the clerk's list. The defendant shall then exercise his peremptory challenges on the same list. If the parties fail to exercise the full number of challenges allowed them, the clerk shall strike the jurors on the bottom of the list until only the number to serve, plus alternates, remain.

Rule 18.5(h) provides that the alternate or alternates shall be selected by lot just before the jury retires to begin deliberations. Rule 18 thus sets forth a comprehensive plan for the selection of jurors, for peremptory challenges, and for designation of alternates by lot. Rule 18.4(c) is specific as to the number of peremptory challenges each party may have in a particular case. The number of peremptory challenges to be had in a criminal case is determined on the basis of the severity of the offense with which the defendant is charged and not on the basis of the number of alternates chosen by the trial court.

In this case the appellant was entitled to ten peremptory challenges by the specific terms of rule 18.4(c) and he received ten peremptory challenges. He cites no authority for the proposition that the trial court should have granted him more than ten peremptory challenges, nor does he cite authority for his proposition that civil rule 47(f) should apply in the face of the specific and comprehensive method of selecting jurors in criminal cases provided in Criminal Rule 18. Further, he does not suggest any way in which he was prejudiced by having only ten challenges in this case. We find no error. *See State v. Gretzler,* 126 Ariz. 60, 78, 612 P.2d 1023, 1041 (1980).[3]

## HEARSAY TESTIMONY

For his third issue on appeal, appellant contends that the trial court erred in allowing Detective Klettlinger to testify to statements Jana Just made to him the day following the death of her mother. The state called the nine-year-old daughter of appel-

---

**3.** It should be noted that two alternate jurors were qualified in this case, and that one juror was required to be excused due to an illness in the middle of the trial.

lant as a witness in its case in chief. During the direct examination of the witness by the prosecutor, the following exchange occurred:

Q: Later on that day do you remember talking to a policeman?

A: Yes.

Q: When you talked to the policeman, Pastor Meyer was there with you?

A: Yes.

Q: And did the policeman ask you what had happened that morning?

A: I don't know, I can't remember.

Q: Do you remember what you talked about with the policeman?

A: I don't know.

Q: Did your dad tell you—that morning did your dad tell you what happened to your mother?

A: I don't know.

The state next called Detective Klettlinger as a witness, and began to question him concerning statements Jana had made to him. Before any of those statements were admitted, the appellant objected to the admission of the statements on the ground that they were not within the definition of non-hearsay pursuant to rule 801(d)(1)(A), Arizona Rules of Evidence. In a reported conference between counsel and the court, the court determined that Jana's statements to Klettlinger were not "prior inconsistent statements" within the meaning of rule 801. The trial court determined that in order to render the statements admissible, the prosecutor would be required to recall Jana as a witness and attempt to refresh her recollection concerning statements her father made to her following the death of her mother and statements she made to the policeman. The appellant agreed with the court's ruling but then objected to the recall of Jana as a witness.

The appellant made a motion pursuant to rule 611(a)(3) to preclude the state from recalling Jana on the grounds of undue harassment and embarrassment. The court noted that it did not consider recalling the witness as harassment, that she did not seem to be under any emotional stress, and that she was bright and alert. The appellant then indicated that if the witness were recalled and testified she did not remember statements her father made to her and statements she made to Klettlinger, her lack of recollection would not lay a foundation for admissibility of Klettlinger's testimony. The trial court determined that Jana would not be required to take the stand again, that there was reliable evidence that she made a material statement to the officer which she could not recall, that the foundation was established for admission of her statement to Klettlinger and allowed the state to question Klettlinger without further foundation.

When direct examination of Klettlinger resumed, the following exchange occurred:

Q [PROSECUTOR]: Detective Klettlinger, before we took a recess, I had asked you to recall your interview with Jana Just.

A: Yes, sir.

Q: During that interview with Jana, did she tell you whether or not she heard anything when she got back to her bedroom after she had been to her mother's and father's bedroom?

A: Yes, sir.

Q: What did she hear?

A: She stated that she heard her mother scream for awhile, then she got quiet, then she heard the shower running and daddy taking a shower.

Q: Did she tell you what her father said to her and the other kids, specifically to her, when the children were out in the front room with their father, after they'd been awakened?

A: Yes, sir.

Q: What did she tell you that he told them?

A: She stated that her father told them that their mother had rolled out of bed onto a knife and stabbed herself with a knife, that he pulled the knife out and held his hand over her mother's mouth so she couldn't scream and awaken the children.

Q: And after he told them this, what did he do, according to Jana?

A: Then he started making telephone calls.

Appellant contends that the admission of Klettlinger's testimony concerning the statements Jana had made to him was inadmissible hearsay pursuant to *State v. Cruz*, 128 Ariz. 538, 627 P.2d 689 (1981) and *State v. Emery*, 131 Ariz. 493, 642 P.2d 838 (1982). He contends that the statement to Klettlinger was not a prior inconsistent statement, that it was not admissible to impeach Jana, and that it was not an excited utterance.

The threshold question presented by this issue is whether the prior statement of Jana to Detective Klettlinger was a prior inconsistent statement within the meaning of rule 801. At least one Arizona case has noted that a prior inconsistent statement is admissible where a witness claims no recollection of the statements. *State v. Allen*, 117 Ariz. 168, 571 P.2d 665 (1977). However, as stated in 1 M. Udall & J. Livermore, *Arizona Practice: Law of Evidence* § 124 at 251 (2nd ed. 1982): "One commentator has suggested that the trial judge should determine whether the loss of memory is real, in which case there is no inconsistency, or feigned to avoid having to testify against another, in which case there is an inconsistency." The rules of evidence dealing with hearsay indicate the soundness of the conclusion that a real loss of memory does not render the prior statement "inconsistent" for purposes of rule 801. Rule 804(a)(3) provides:

"Unavailability as a witness" includes situations in which the declarant—(3) testifies to a lack of memory of the subject matter of his statement . . . .

■■■ We find that Jana Just's statements made to Detective Klettlinger the day following her mother's death were not inconsistent with her trial testimony. The statements were made by a young child the day following her mother's death and long prior to her father's trial. She was subsequently interviewed by numerous investigators and attorneys in preparation for the trial. Under what could only be the most trying circumstances for a young child, it is possible that she would have forgotten a statement made by her to one of many officers the day following her mother's death. She specifically testified to a lack of memory of her statements to detective Klettlinger. The trial court could well have believed that her lack of memory was not feigned. We conclude, therefore, that the statements made to Klettlinger were not inconsistent with her trial testimony, and that her lack of memory rendered her "unavailable" as a witness within the meaning of rule 804(a)(3) as to those statements.

The question then becomes whether the statements were admissible under any exception listed in rule 804(b). We note that while the argument in the trial court focused on whether or not Jana's statement to the police detective was a prior inconsistent statement, the trial judge did find Rule 803(24) applied. That is the catchall exception to the hearsay rule to be employed in situations where the availability of the declarant is immaterial. The identical provision of Rule 804 would have been more appropriate since the witness's inability to remember rendered her unavailable. Rule 804(b)(5) provides:

Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the state-

ment and the particulars of it, including the name and address of the declarant.

Apparently the judge shied away from relying on this provision because the state had not provided the requisite notice that it intended to use the hearsay. We observe in passing that since the defense had long had access to the witness and, we presume, access to the police reports, the failure to give formal notice that the state would use the hearsay would probably not have prejudiced the defense. It is difficult to imagine just what more the defense could have done or what it could have done differently had it received notice.

■ Even if the admission of the statement was error it was not prejudicial because Just himself testified to precisely the same things that the detective said the girl told him. Just testified that he was in the kitchen when he heard his wife scream, that he found her with a knife in her chest and pulled it out, that Jana came into the room and turned on the light, that he held his hand over his wife's mouth to quiet her screams, that he told Jana to turn off the light and go back to sleep, and that he took a shower, awakened the children and told them that their mother had rolled or fallen out of bed onto a knife. He also testified that Jana had asked him, "what about the fight, daddy?" Just does not suggest that the admission of Jana's statement forced him to take the stand when he otherwise would not have done so.

In an effort to get around this obvious lack of prejudice the appellant argues that with the admission of Jana's hearsay statement as to what he told the children an inconsistency in his story was introduced that the state "leaned heavily on." The supposed inconsistency is that he told the children that their mother rolled on a knife, while he testified that he was in the kitchen when the accident happened and *assumed* she had rolled on the knife. There are two reasons why this highly contrived argument fails:

*First:* The so-called inconsistency is not particularly damaging. To say that someone rolled on the knife does not exclude the

idea that the speaker assumed from the circumstances that that was what had happened.

*Second:* Jana's statement is not the only source of the supposed inconsistency. Just himself gave a statement to Detective Klettlinger to the effect that he *told* the children that his wife rolled on the knife, as opposed to telling the children that he *assumed* his wife fell on the knife. The prosecutor would have been able to make the identical argument on the basis of evidence whose admission was not contested.

## MOTION FOR JUDGMENT OF ACQUITTAL

For his fourth issue on appeal, appellant asserts that the trial court erred in denying his motions for a judgment of acquittal. *See* Rule 20, Arizona Rules of Criminal Procedure. Particularly, he asserts that there was no evidence of premeditation, and that the trial court erred in submitting the case to the jury on the charge of first degree murder; further, he asserts that the evidence of second degree murder was speculative.

■ Where the evidence raises a question of fact for the jury and the evidence, if believed, would be sufficient to sustain a conviction, it is not only proper to deny a motion for a directed verdict of acquittal, but it is error to grant the motion "when the evidence is such that reasonable minds could differ on the inferences to be drawn therefrom." *State v. Hickle,* 129 Ariz. 330, 331, 631 P.2d 112, 113 (1981). Further, the credibility of the witnesses and the weight to be given to their testimony is to be determined by the trial jury and not by the trial judge when the case is tried before a jury. *Id.*

At the time the trial court ruled on the motion for judgment of acquittal, it listed the factors it had considered as indicative of premeditation for purposes of submitting the charge of first degree murder to the jury. The trial court noted that the cuts and bruises on the victim were not the result of an accident. The trial court be-

lieved that acts which occurred subsequent to the infliction of the wound like washing the knife to possibly remove fingerprints and washing the towels and the body of the victim are all factors which indicated premeditation. Testimony was presented that Jana Just heard her mother say, "Al, stop it." Further, when Jana entered the room in response to her mother's screams, the lights were off, and she turned them on. Appellant had her turn the lights back off. When the police asked appellant whether the victim could have been murdered by burglars, he stated, "I wouldn't believe that, would you?" His statement could indicate that he had thought of an explanation to tell the police and had rejected an explanation involving a burglar. The location of the knife relative to where the parties were sleeping was another factor which indicated premeditation. The coroner testified that force was required to inflict the wounds which caused the death of the victim. The bedroom in which the victim was located was in disarray.

■ Many of the factors that the trial judge apparently thought important on the subject really do not suggest premeditation. For example, constructing a story consistent with innocence after the fact suggests a desire to avoid the consequences of the crime but tells little about premeditation. Indeed, an explanation of innocence as implausible as Just's suggests a lack of premeditation. Most people who planned a murder could have carried it off in a manner that would have left them with a better defense than Just was able to put forward. Nevertheless, the presence of a knife in the bedroom together with the evidence of an argument, together with the existing state of law in Arizona to the effect that the requisite intention to kill need only precede the killing by the length of time needed to permit reflection is enough to support the submission of the charge of first degree murder to the jury. *See* A.R.S. § 13–1101 and *Macias v. State*, 36 Ariz. 140, 283 P. 711 (1929).

■ Our Supreme Court has affirmed convictions of second degree murder where the trial court denied a directed verdict of acquittal as to murder in the first and second degrees. *State v. Mojarro Padilla*, 107 Ariz. 134, 140, 483 P.2d 549, 555 (1971); *State v. Moore*, 112 Ariz. 271, 273, 540 P.2d 1252, 1254 (1975). However, the Supreme Court has more recently indicated that where crimes are divided into degrees and the evidence is insufficient to convict of the higher degree charged, it is error for the trial court to deny a motion for a judgment of acquittal as to the higher offense. *State v. Franklin*, 130 Ariz. 291, 293–94, 635 P.2d 1213, 1215–16 (1981). Franklin was charged with armed robbery and convicted of robbery. The trial court erroneously denied his motion for judgment of acquittal to the charge of armed robbery. The Supreme Court determined that the error was harmless and affirmed the conviction even though it recognized the danger of a compromise verdict which inheres when the trial court erroneously allows a case to go to the jury on different degrees of the same crime. The Supreme Court specifically noted where the facts adduced at trial clearly support the verdict, the mere possibility of a compromise verdict is not a sufficient ground for reversal. In this case appellant does not assert any prejudice flowing from the denial of his motions for judgment of acquittal nor do we find any in the record. Assuming that the trial court erroneously denied the motion for judgment of acquittal as to first degree murder, we would find that error to be harmless beyond a reasonable doubt. *State v. Franklin, supra.*

The evidence to support submission to the jury on second degree murder was ample and in fact very strong.

## MOTION TO SEQUESTER THE JURY

For his fifth issue on appeal, appellant asserts that the trial court erred in denying his motions to sequester the jury. *See* Rule 19.4, Arizona Rules of Criminal Procedure. At the close of the state's case, the trial court denied appellant's motion for a judgment of acquittal. The court denied the motion after argument in chambers on

the record. The court stated on the record "Mr. [Brent] Whiting from the press is present." The jury was not present. In denying the motion, the court noted its belief that appellant's washing the bedding was suspicious, that in washing off the knife, there was an inference that the defendant wished to make sure there were no fingerprints, that the fact that the lights in the bedroom were off was consistent with the defendant doing something to his wife intentionally, that the fact that he told Jana to turn the light back off was evidence that he had committed the crime. The trial court also noted its own belief that there was substantial evidence of premeditation. The appellant argues that the ruling was "personalized" by the trial court in that it indicated the trial court's own opinion concerning what the evidence showed, that the ruling "virtually endorsed the state's case."

Appellant was concerned that Mr. Whiting, a reporter for the Arizona Republic, would report the court's ruling and moved to have the jury sequestered. The trial court denied the motion. At the close of all evidence, appellant again moved to sequester the jury. The trial court again denied that motion. Appellant asserts on appeal that the jurors were exposed to continuous publicity and probably exposed to the offhand remarks of their spouses, friends and others concerning the case due to the great publicity.

 After the trial judge denied appellant's first motion to sequester the jury, he admonished the jurors not to expose themselves to any account of the trial which might appear in the media. The trial court had also admonished the jury at the beginning of the case, and at the close of each day. Appellant contends nevertheless that the trial jurors must have been exposed to the publicity and that one juror "got the distinct impression some other jurors had, in fact, looked at news articles." The record reveals not a scintilla of evidence to the effect that the jurors did read or hear news accounts of the trial other than the unestablished impression by one juror that other jurors had looked at news articles.

The determination of whether to sequester the jury is within the discretion of the trial court. *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982); *State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828, *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). The trial court's ruling will not be disturbed on appeal absent a clear showing of abuse of discretion and prejudice to the defendant. *State v. Schad, supra.* The burden of proving that trial publicity actually prejudiced the jury is on the defendant. *Id.* In this case the record is silent concerning the effect, if any, of the trial publicity on the jury. The defendant has thus failed to establish his burden that the publicity prejudiced the jury. Therefore, we will not disturb the trial court's ruling in this matter on appeal. *State v. Schad, supra.*

## INSTRUCTIONS

For his next issue, the appellant contends that the trial court erred in instructing the jury on the elements of first degree and second degree murder, and that the trial court erred in giving a limiting instruction on the use of reputation testimony. The indictment in this case charged the appellant as follows:

 or about the 21st day of July, 1980, ALLAN HAROLD JUST, ... knowing that his conduct would cause death, with premeditation caused the death of SHARON RUTH JUST, by the use of a dangerous instrument or deadly weapon, to-wit: A KNIFE, in violation of A.R.S. § 13–1105, 13–1101, 13–703 and 13–604.

Because the indictment did not charge the appellant with intentionally killing his wife, the court deleted from the instructions references to an intentional killing. The jury was instructed as follows:

The crime of first degree murder requires proof of the following three things: 1. the defendant caused the death of another person; 2. the defendant knew that he would cause the death

of another person; and 3. the defendant acted with premeditation.

\* \* \* \* \* \*

The difference between first degree murder and second degree murder is that second degree murder does not require premeditation by the defendant. The crime of second degree murder requires proof that the defendant caused the death of another person by conduct which he knew would cause death or serious physical injury.

The trial court instructed on premeditation as follows:

Premeditation means that the defendant's knowledge existed before the killing long enough to permit reflection. However, the time for reflection must be longer than the time required merely to form the knowledge that conduct will cause death.

■■■■ Appellant asserts that because the current first degree murder statute adds the culpable mental state of intentional conduct, the jury was never required to consider the highest form of culpable mental state, which is intentional. He asserts that the trial court essentially declared the legislative amendment adding the culpable mental state of intentional as surplusage. He concludes that he was therefore charged under a previously repealed statute. We disagree.

A.R.S. § 13–1105(A)(1) provides:

A person commits first degree murder if: 1. Intending or knowing that his conduct will cause death, such person causes the death of another with premeditation . . .

The language of the statute is clearly disjunctive. A person may be guilty of first degree murder by causing the death of another with premeditation either intentionally *or* knowingly. A.R.S. § 13–1104 provides for second degree murder under three alternative culpable mental states, intentionally, knowingly, or recklessly. In this case, the grand jury indicted the appellant for knowingly causing the death of his wife with premeditation. This indictment was proper under the disjunctive language

in A.R.S. § 13–1105. Because the indictment charged the appellant with knowingly committing first degree murder, it was likewise proper for the trial court to instruct the jury on second degree murder pursuant to A.R.S. § 13–1104(A)(2) which provides for the culpable mental state of "knowingly." Given that the appellant was not charged with the intentional killing of his wife, and further, given that the statutes provide for "knowing" first degree murder and second degree murder, we find no error in the trial court's refusal to instruct on the culpable mental state of intentional.

■■■■ Appellant also contends that the trial court erred in instructing the jury as follows:

The defendant has introduced evidence of his good reputation in the community. Consider the evidence of good reputation together with all the other evidence. If you are convinced beyond a reasonable doubt that the defendant is guilty of the crime charged, you must not use evidence of good reputation as an excuse to acquit the defendant.

Appellant contends that this instruction was improper for three reasons: first, that it was a comment on the evidence; second, that the defense evidence was not character evidence but was adduced in order to illustrate the absence of motive; and third, that the comment to the instruction states that it ought not to be given unless it is requested by the defendant.

As to appellant's first contention, because the instruction did not involve an expression of opinion by the trial court, it did not constitute a comment on the evidence. Ariz. Const. art. 6, § 27; *State v. Barnes*, 124 Ariz. 586, 590, 606 P.2d 802, 806 (1980). Second, although appellant contends that the evidence concerning his character was introduced only for purposes of showing that he had no motive to kill his wife, and that the instruction was not warranted, his argument ignores the clear nature of the defense evidence. While it is true that no witness was asked "Do you know the defendant's reputation in the

community?", appellant presented the testimony of more than 20 character witnesses. These witnesses detailed the circumstances of appellant's life from the date of his birth through the date of trial. They testified to appellant's many accomplishments as a boy, as a student athlete, as a coach, and as a counselor. They testified concerning the nature of the relationship between appellant and his family, the extraordinary intimacy between appellant and his wife, and between the parents and the children. While this testimony may have been introduced for the purpose of establishing that appellant had no motive to kill his wife, it also inherently constituted character and reputation evidence which reflected most favorably on appellant's character. Given the abundance of such evidence in this case, we hold that the trial court did not err in granting the state's requested instruction on the use of reputation evidence.

Finally, appellant contends that the trial court erred in granting the instruction because the comment to the instruction indicates that it should be given only at the request of the defendant. Other than the comment to the instruction contained in the Recommended Arizona Jury Instructions, appellant cites no authority for his proposition that the instructions should be given at the request of the defendant only. As the state aptly points out, "one is given pause to wonder why, and under what circumstances, a defendant would request such an instruction." The state concludes that the defendant should not be allowed to adduce abundant evidence of his good character and reputation without the jury being advised that such evidence is not an excuse to acquit a defendant whom the jury may have otherwise found guilty beyond a reasonable doubt. We hold that the giving of the instruction was not error in this case.

For his final argument concerning the court's instructions, appellant contends the trial court erred when it refused to grant his requested instruction to the effect that appellant could not be convicted because of his failure to obtain medical assistance for the victim. The parties stipulated at the close of evidence that the victim's death was not caused by appellant's failure to obtain assistance. The stipulation was read into the record. Neither party argued that appellant could be convicted for his failure to obtain assistance. The state's theory of the case was that appellant caused the death of Sharon Just by inflicting the stab wound. The appellant argued that he was not in the bedroom at the time the knife entered her body. There was neither evidence nor argument presented to the effect that her death was caused by his failure to obtain assistance. In fact, Doctor Karnitschnig testified that it was highly unlikely that she could have been saved by even immediate surgical assistance. The evidence thus did not warrant the giving of the instruction. Further, the jury was properly instructed concerning the kinds of acts which must be committed by a person before he can be convicted of first or second degree murder. We find that the trial court did not err in refusing to give the requested instruction.

## CLOSING ARGUMENT

Appellant next contends, without citing authority, that he was denied due process because of the timing of closing argument. The presentation of evidence was completed Thursday afternoon, June 4, 1981. The prosecutor made his closing argument, the defense commenced its closing argument at 6:20 p.m. that evening. The court recessed at 7:40 p.m. and reconvened at 8:10 p.m. Defense counsel completed his argument at approximately 9:00 p.m. The prosecutor made his rebuttal closing argument; the jury was instructed, and sent home for the night just prior to 10:00 p.m. The appellant argues that this procedure caused the jury to be mentally glazed and ignore his persuasive argument which was "just as logical and likely as the state's rather bizarre theory that Al Just for no reason at all would suddenly stab his wife after they ate zucchini together." He asserts that whatever impact his closing argument could have had on the jury was lost when the jury was sent home for the

night, and that therefore he was effectively denied his right to a jury trial and to due process.

There is no evidence in the record to support appellant's contention that the jury was not alert and fully attentive during his argument. The state further points out that not only has appellant not shown prejudice due to the timing of the closing arguments, but also, both the prosecutor and defense counsel argued that evening. The trial court has full discretion in the conduct of the trial, and that discretion will not be overturned on appeal absent a clear showing of an abuse of discretion. *State v. Mangrum*, 98 Ariz. 279, 403 P.2d 925 (1965). Appellant has failed to establish that the trial court abused its discretion.

### SENTENCE

For his final claim of error, appellant asserts that the trial court violated A.R.S. § 13–702 and that it abused its discretion in imposing sentence. The presumptive term for second degree murder, a dangerous nature felony, was 10.5 years and the maximum was 21 years. The trial court sentenced appellant to serve 15 years. Appellant asserts that because the sentence exceeded the presumptive term, the court was required to articulate factual findings and reasons in support of the findings in aggravation at the time of sentencing. Appellant contends that the trial court improperly found certain facts to be aggravating.

█ At the time of sentencing, the trial court found certain circumstances to be both mitigating and aggravating. It found as a mitigating circumstance that the appellant had no prior criminal record. It also found as a mitigating circumstance that appellant had been an outstanding member of society, and an outstanding husband and father. The trial court stated that but for those mitigating circumstances it would impose the maximum sentence for the offense. The court also noted that the probation officer's and psychologist's reports indicated other mitigating circumstances namely, their opinion that appellant was not a danger to society, and that the

killing was an isolated incident. The trial court noted that in all probability it was an isolated incident. Nevertheless the trial court stated as follows:

[I]t is very difficult to accept that without some doubt, because there was never any motive established for what you did, why you did it, and until and unless I know the why, motive in this case, I find it hard to say unequivocally that it wouldn't happen again, that you are not a danger to society, because I don't know why you did what you did, no one does and, therefore, as I say, I cannot accept unequivocally the statement that it would never happen again, that it was only an isolated incident.

The trial court also found that appellant's close and loving relationship with his wife was both a mitigating and aggravating circumstance because, in the judgment of the trial court, it was even worse that the appellant would be the one to kill his wife, "a wife of nearly fifteen years at the time of death, a wife who had returned your love and your support and your trust, yet under those circumstances you killed that person." The trial court found as mitigating the fact that the appellant had four children, but found as aggravating the fact that the appellant had deprived the four children of their mother when they were in the same house where the killing occurred. The trial court also found as aggravating the fact that the appellant's ability to appreciate the wrongfulness of his conduct was not in any manner impaired. Finally, the trial court found as aggravating the fact that the victim suffered before she died.

Appellant contends that the trial court did not make a specific finding of a "true" fact that the appellant was a danger to society, and that the court's statement that it could not find that this was an isolated offense could not therefore stand as an aggravating factor. Appellant further argues that his ability to appreciate what he was doing and the fact that it was wrong was not impaired could not be an aggravating circumstance, but is listed only as a

mitigating circumstance under A.R.S. § 13–702(E)(2). He also urges that the trial court erred in finding as aggravating the fact that the victim suffered before she died because there was no evidence of choking, beating, multiple stab wounds, or anything which would justify a finding of "especially heinous, cruel or depraved manner in which the offense was committed" within the meaning of A.R.S. § 13–702(D)(5).

When the sentence imposed is greater than the presumptive, the trial court must make specific findings that the aggravating factors are true, and that they call for imposition of punishment greater than the presumptive. A.R.S. § 13–702(C); *State v. Mahler*, 128 Ariz. 429, 626 P.2d 593 (1981); *State v. Winans*, 124 Ariz. 502, 605 P.2d 904 (App.1979). The appellant does not argue that the trial court did not make such findings, but rather, argues that the trial court took what should have been considered as mitigating factors and treated them as aggravating factors. We agree and remand this case for resentencing.

A.R.S. § 13–702(D)(9) provides that the court may consider as aggravating circumstances, not only the enumerated circumstances set forth in A.R.S. § 13–702(D)(1) through (8), but also "any other factors which the court may deem appropriate to ends of justice." In this case, the jury clearly found that appellant had caused the death of his wife by stabbing her when their four young children were in the same house. The evidence further clearly reflected that the victim did suffer before she died as indicated by the struggle between appellant and the deceased. The evidence also revealed that the victim had been an extraordinarily loving and good mother, and the deprivation to the children was surely great. The trial court properly found as aggravating the above factors.

However, we agree with appellant that the trial court improperly found as aggravating some factors which the legislature clearly did not intend to be aggravating. Primarily, the trial court found as aggravating the fact that appellant had led an exemplary life up to the date of the offense in question, and under such circumstances, clearly understood the difference between right and wrong. While we appreciate the difficulty faced by the trial court in imposing sentence for such an inexplicable and tragic offense, we find that the use of the appellant's prior exemplary life and clear ability to appreciate the difference between right and wrong as aggravating circumstances was improper. Carried to its logical extreme, this analysis would lead to the conclusion that persons with a history of prior criminal conduct should *not* receive aggravated sentences because their ability to distinguish between right and wrong may not be as great as that of one who has led an exemplary life. Obviously, such could not have been the intent of the legislature in promulgating the comprehensive sentencing scheme of the current criminal code. Accordingly, we are constrained to remand this case for resentencing.

Appellant also argues that because the infliction of death is an element of second degree murder and because the use of a deadly weapon is already taken into account by virtue of A.R.S. § 13–604, neither circumstance could be considered as aggravating pursuant to A.R.S. § 13–702. These claims have been decided adversely to appellant in *State v. Bly*, 127 Ariz. 370, 621 P.2d 279 (1980).

For the foregoing reasons the judgment of conviction is affirmed and this case is remanded for resentencing.

KLEINSCHMIDT, P.J., and FROEB, J., concur.