698 P.2d 1244

**STATE of Arizona, Appellee,**

v.

**Paul A. WILEY, Jr., Appellant.**

No. 6123.

Supreme Court of Arizona,
In Banc.

April 23, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Galen H. Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

**528**

Gentry, Desens & Behrens by Stephen M. Desens, Bisbee, for appellant.

CAMERON, Justice.

Defendant, Paul A. Wiley, was convicted and adjudged guilty of first degree murder, A.R.S. § 13–1105(A)(2); burglary in the second degree, A.R.S. § 13–1507; kidnapping, A.R.S. §§ 13–1304(A)(3) and (4); and robbery, A.R.S. § 13–1902. Defendant was sentenced to life imprisonment without possibility of parole for twenty-five years for the murder, A.R.S. § 13–703; fifteen years for the burglary charge, §§ 13–604, –701; twenty-one years for the kidnapping charge, §§ 13–604, –701; and eight years for the robbery, §§ 13–701, –702. All sentences were to run concurrently. We have jurisdiction pursuant to Ariz. Const. Art. 6, § 5(3) and A.R.S. § 13–4031. We affirm.

We must decide the following issues:

1. Did the police have the requisite quantum of suspicion when they first stopped defendant at 4:30 and when they later arrested him?

2. Did the trial court err in denying defendant's motion to dismiss the felony murder count in the indictment or, in the alternative, in refusing to remand to the Grand Jury for a new determination of probable cause?

3. Did the trial court improperly refuse to sever defendant's case from his co-defendant's case?

4. Did the trial court conduct an improper voir dire of the jury?

5. Were the prosecutor's peremptory challenges against three black veniremen improper?

6. Were defendant's due process rights violated by the loss of certain evidence and the trial court's refusal to give the requested *Willits* instruction?

7. Should the trial court have directed a verdict of not guilty?

8. Did the trial court improperly instruct the jury concerning the causation elements of felony murder?

9. Should the jury have been instructed as to the elements of second degree murder, manslaughter and negligent homicide?

10. Did the trial court err in charging the jury on the elements of both felony murder and the underlying felonies?

The facts follow. On 10 May 1983, defendant, co-defendant Calvin Lawson, and Courtney Brown were driving from New Mexico through Arizona. At approximately 3:30 P.M., they entered Bowie, Arizona, which is located in Cochise County. They stopped at a gas station where they saw the victim, 70 year old Steven Bayne. Defendant and Lawson decided to follow him back to his house. They parked the car next to the field in the back of the victim's house, and the two men got out of the car to go inside. Before doing so, they took the sash from a turquoise colored robe that Ms. Brown had with her. They went into the house where they remained for approximately fifteen minutes. According to the testimony of Courtney Brown, when they returned, Lawson was carrying a tan case and the two men were discussing how "the old guy sure did put up a good fight." They then drove toward Pima County.

At approximately 6:00 P.M. that evening, Paul Ronquillo was driving past the victim's house. He noticed that smoke was coming out of one of the windows and called the fire department. The firemen arrived about ten minutes later. Although there were no open flames, the house was filled with heavy smoke.

A great deal of smoke was coming from the victim's bed. When the firemen turned their hoses onto it, they heard a crackling noise. They looked underneath the mattress and found a small lamp lying between the mattress and the box springs. The lamp was three to four inches from the edge of the bed. The mattress was completely scorched. A fire expert testified that the fire had started in the area where the lamp had been placed. A second expert testified that the light bulb had been slight-

ly unscrewed to create an arc and the lamp had started the fire.

The firemen found the decedent lying face down in a hallway; his hands and feet were bound with a blue piece of material. An autopsy revealed that the victim had died from smoke inhalation. In addition, the medical examiner testified that the victim had numerous injuries on his face, thorax, brain, chest, arms, hips and legs indicating that he had been beaten.

Defendant was arrested at 7:50 that evening. On 13 May 1983 defendant was indicted for first degree murder, burglary in the second degree, arson, robbery and kidnapping. The arson count was subsequently dismissed. From his conviction and sentence, defendant appeals.

## THE ARREST

Defendant and his two accomplices were stopped at 4:30 P.M., released and then stopped and arrested at 7:30 P.M. Defendant now argues that both stops were illegal. He claims that the police needed probable cause for both traffic stops and that they did not have it at either time. As a result, he asserts that any evidence was illegally seized and inadmissible at trial. We do not agree.

### 1. The 4:30 Stop

The events that led to the initial stop were as follow: In order to enter Arizona, defendant had to drive through the San Simeon agricultural inspection station. At approximately 2:50, the Agricultural Inspector on duty received complaints from tourists that defendant's car, an old Falcon with Virginia license plate number CYP–114, had been weaving along the highway. She saw a car a few minutes later, weaving as it came to the station. It was a "beat-up looking, older model Falcon." While she and her supervisor made their inspection, she noticed that the occupants, two black males and a white female, seemed "giddy." She also observed that the woman was holding a beer can. The Agricultural Inspector wrote down the license number, VA CYP–114. After the car

left the station, a truck pulled in. The driver informed the Inspector that the people in the car had attempted to sell him drugs and that the female passenger had offered sexual services. He had written down the license plate number, and it was the same as that of defendant's car. The Inspector then contacted the Department of Public Safety (DPS) and the Sheriff's Office in Wilcox, Arizona, some 80 miles west of San Simeon, informing them of both the truck driver's allegations and the possibility of a DWI.

At approximately 4:00 P.M., Deputies Allaire and Wolsagle, from the Cochise County sheriff's office in Wilcox, waited at Milepost 344 in Wilcox for the car to pass. While they were waiting, the truck driver stopped and told them of his earlier experiences with the passengers in the car. He described them as two Negro males and one white female. Because the officers thought the car might have stopped in Bowie, 30 miles west of San Simeon and 50 miles east of Wilcox, they radioed this information to the deputy there.

Several minutes later, as the deputies began driving toward Bowie, they saw the car—a late model Ford Falcon with Virginia license plate number CYP–114—carrying two black males and a white female. They stopped the car and checked the identification of all three passengers and the registration of defendant, who was driving. At that time, the police noticed some "roach-clips" and open beer cans. They also saw a pair of binoculars, turquoise jewelry and a hunting knife. While one of the deputies conducted a field sobriety test with defendant, the second deputy noted a wristwatch lying on the pavement slightly under the car. He picked it up and asked Lawson whether he had thrown the watch out. Lawson stated that he had not and the deputy kept the watch. The deputies then helped jump start the car and allowed the parties to drive away. The entire stop took somewhere between thirty and forty-five minutes.

Defendant maintains that, under *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct.

2248, 60 L.Ed.2d 824 (1979), the police were required to have probable cause to believe that a felony had been or was about to be committed in order to warrant this stop. He reads Dunaway to mean that "when one is rendered by the police unable to exercise his freedom of movement, probable cause is required to justify such detention, whether it qualifies as a full-blown arrest or not." We believe defendant misread the law. In *Dunaway*, "the detention of petitioner was in important respects indistinguishable from a traditional arrest." *Id.* at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 835. Petitioner was taken from a neighbor's house to the police interrogation room and never informed that he was free to go. *Id.* The court found that this treatment amounted to an arrest requiring probable cause. Not all seizures, however, require probable cause. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer was free to detain a person in order to investigate criminal activity if he had a *reasonable, articulable suspicion* that a particular person had committed, was committing, or was about to commit a crime. Thus, a person may be "seized" even though there is no probable cause to make an arrest. *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. To determine whether the seizure and ensuing search were reasonable, our inquiry is two-fold: "first, one must consider 'whether the ... action was justified at its inception'; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " New Jersey v. T.L.O., 36 Crim.L.Rep. 3091, 3095 (U.S. 16 Jan.1985); *see also State v. Jarzab*, 123 Ariz. 308, 310, 599 P.2d 761, 763 (1979), cert. denied, 444 U.S. 1102, 100 S.Ct. 1069, 62 L.Ed.2d 789 (1980).

We find that this was a proper stop. First, the deputies possessed the requisite suspicion. The Agricultural Inspector had informed them of the likelihood that the driver of the car was alcohol or drug impaired. Additionally, the truck driver indicated that defendant and his friends may have been transporting drugs and persons for the purpose of prostitution, both potential felonies. *See* A.R.S. §§ 13–3210, –3404. He gave both the deputies and the Agricultural Inspector an accurate description of the car and license plate, insuring his reliability. These facts created a reasonable suspicion of criminality sufficient to warrant the police making an investigative stop.

The stop was also carefully tailored to determine whether defendant was driving while intoxicated or transporting drugs. The deputies looked inside the car briefly, asked for identification and then asked defendant to perform a sobriety test. The deputies did not make a full-blown search of the car although, having seen the hunting knife, they would have been allowed to do so. *Cf. Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (police were justified, upon viewing a hunting knife in defendant's car in making a further search of the passenger compartment of the car, to determine whether there were other weapons). We, therefore, find that the 4:30 stop was proper.

2. The Arrest

■ The facts leading up to the arrest are as follow: At approximately 6:35, Deputy Michael S. Rafferty received a call to go to Steven Bayne's house. He was told that the Fire Department, while putting out a fire, had found a body inside the house. Deputy Rafferty arrived there and observed the body. The hands and feet were tied. Rafferty then talked with Carmelo Sanchez, who stated that he had seen a strange car parked in the street behind decedent's house. Mr. Sanchez had noticed the car because it was parked in an unusual spot and because the woman sitting in it did not appear to be from Bowie. He described the car as a "smaller to middle-size, dark bluish car, an older one." He also said that he had seen two black men around the car. These men were obviously strangers because there were no blacks living in Bowie at that time. The car had been parked about fifty feet from Bayne's

house and had left a tire track on the dirt. Deputy Rafferty noticed a path going from the tire track to the area of the house. Because the firemen had been working around that area of the house, it was impossible to determine whether the path led into the house.

Rafferty also talked to fourteen year old Greg Hernandez. He stated that he had seen a car pulling hurriedly away from the victim's house at approximately 4:05. It is unclear whether he stated that he saw two black men and a white woman or three black men. Hernandez stated that the car was a dark, middle size car with no front grille. Upon hearing these statements, a DPS officer present at the scene informed Rafferty that he had received information about a dark blue Ford with Virginia license plates, containing two black males and a white woman. It had allegedly been involved in some "illegal activity down by the Port of entry" and was believed to have headed into Bowie. At 6:48, on the basis of this information, Deputy Rafferty broadcast an "Attempt to Locate" (ATL) request that the police detain the passengers in the car for questioning.

The time sequence of the following facts is somewhat confusing. Sometime after 6:00 P.M., Carol Bredko, one of the victim's neighbors, arrived at the house. She told the deputies that she had seen the victim alive at around 3:30 that afternoon. Ms. Bredko also stated that the victim had a white-handled hunting knife about eight inches long. Just prior to the time defendant was arrested, Deputy Allaire arrived at the house. At some point before 7:30, Allaire informed Rafferty that he had seen a bone-handled hunting knife in the blue Ford that he had stopped earlier. It was later determined, however, that the knife belonged to a hitchhiker. At approximately 7:50, Deputy Ken Gallagher spotted defendant's car travelling on Interstate 10 in Pima County. As a result of the ATL, he arrested defendant and the other passengers in the car.

Defendant maintains that the police did not have probable cause to make the arrest. We do not agree.

We have stated that a police officer has probable cause for an arrest if he has "reasonable grounds to believe that an offense is being or has been committed by the person arrested * * *." *State v. Torrez*, 112 Ariz. 525, 527, 544 P.2d 207, 209 (1975), cert. denied, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 767 (1976). In reviewing whether probable cause exists, we look to the totality of the facts and circumstances, *State v. Million*, 120 Ariz. 10, 15, 583 P.2d 897, 902 (1978), known to the police officers at the time of the arrest. *United States v. Sherman*, 430 F.2d 1402, 1405 (9th Cir.1970), cert. denied, 401 U.S. 908, 91 S.Ct. 865, 27 L.Ed.2d 805 (1971). It is also not essential that the arresting officer personally be in possession of all the facts as long as "probable cause exists from the collective knowledge of all the law enforcement agents involved in this operation." *State v. Sardo*, 112 Ariz. 509, 514, 543 P.2d 1138, 1143 (1975).

Here we find that probable cause existed. There was no question that a felony had been committed. The police found the victim's hands and feet tied behind him, indicating the possibility of a homicide. The police were also aware that the victim had been alive at least until 3:30 P.M. They knew that a blue car with three out-of-town residents, two of whom were black, had been parked near the victim's house at around 4:00 P.M. They found tracks that led from where the car had been parked to the area of the house; these were the only tracks going from the road to the house. Additionally, one of the police officers had seen articles, such as the knife, that he could have reasonably believed were taken from the victim's house, in a car in the Bowie/Wilcox area shortly after the car described by Sanchez was seen outside of Bayne's home. The cars were similar in description. We find that these circumstances were sufficient to establish probable cause and that the arrest was proper.

## THE GRAND JURY PROCEEDINGS

 On 13 May 1983, the Grand Jury voted to indict defendant for first degree murder, which included felony murder, arson, burglary, robbery and kidnapping. On 23 August, the trial court dismissed the arson charge with prejudice. Defendant argued at that time that the foundation for the felony murder count was improper and, therefore, should have been dismissed or remanded to the Grand Jury for a redetermination of probable cause. The trial court denied this request. Defendant now contends that this denial was in error.

We find this issue no longer to be of consequence. As our Court of Appeals has stated:

> [T]he purpose of a grand jury proceeding is to determine whether there is probable cause to believe that the individual committed an offense, and that "[p]rior to trial the question of whether probable cause exists is an open one, however, after a full scale trial in which a jury determines guilt beyond a reasonable doubt the question is closed."

*State v. Just*, 138 Ariz. 534, 541, 675 P.2d 1353, 1360 (App.1983). Here, defendant was convicted after a jury trial. Accordingly, we find the issue to be moot and decline its review.

## SEVERANCE

 Prior to trial, both defendant and Lawson filed a motion to sever pursuant to Rule 13.4, Arizona Rules of Criminal Procedure, 17 A.R.S., in order to allow them to be tried separately. The trial court denied this motion. Defendant renewed this request several times during the course of the trial. Each time, his motion was denied. Defendant now claims that the refusal to sever violated his sixth amendment right to confront his accusers. U.S. Const. Amend VI. He argues that he was prejudiced by the admission of evidence against his co-defendant. We do not agree.

In almost all instances where defendants are tried jointly, there is some possibility that the jurors might confuse evidence introduced against one defendant with proof of guilt against the other. Nonetheless, essentially because of considerations of judicial economy, "[j]oint trials are the rule rather than the exception * * *." *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir.), cert. denied, 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). For instance, in cases where the crimes of the two defendants are so intertwined that it is difficult, if not impossible, to separate proof of one defendant's crimes from that of the co-defendant's, it would be a waste of resources to require individual trials. *See, e.g., State v. McGill*, 119 Ariz. 329, 331, 580 P.2d 1183, 1185 (1978). The case at bar is the type of case in which joinder is proper. The defendants' actions were so closely linked that it would be a waste of judicial time to require the state to prove the same set of facts and produce the same witnesses twice.

In order to prevent potential juror confusion, the trial court must instruct the jury to consider the evidence against each defendant separately. *Cf. Parker v. Randolph*, 442 U.S. 62, 73–74, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979). Here, the judge gave the jury charge requested by the State:

> It is your duty to give separate, personal consideration to the case of each individual defendant. When you do so, you should analyze what the evidence on the case shows with respect to that individual, leaving out of consideration entirely, any evidence admitted solely against some other defendant or defendants.
>
> Each defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct and any other evidence in the case which may be applicable to him.

This instruction was more extensive than the requirements outlined in the RAJI instruction.[1] In light of our constitutional

---

1. Those instructions are as follows:
 There are [two] defendants. You must consider the evidence in the case as a whole. However, you must consider the *charge* against each defendant separately.

requirement that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon but shall declare the law * * * *", Ariz. Const. Art. 6, § 27, the trial court gave the most thorough instruction possible. Although defendant objected to this instruction, he was unable to suggest an alternative. We find that this charge was adequate to cure the potential "rub-off" complained of by defendant.

We recognize that there are instances where such a curative instruction will be inadequate. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 476 (1968), the Supreme Court found that when a nontestifying co-defendant's confession is introduced against him, no instruction will cure the confrontation problem created if that confession contains facts inculpating defendant. *See also United States v. Singer*, 732 F.2d 631, 635 (8th Cir.1984) (evidence against one defendant is so drastically disproportionate that the jury is unable to compartmentalize the evidence as it relates to separate defendants); *United States v. Reeves*, 730 F.2d 1189, 1197 (8th Cir.1984) (evidence was extremely complicated such that it was difficult for the jury to sort out the scope of each defendant's involvement). These cases, however, are exceptions, created by unique circumstances, to the "crucial assumption * * * that juries will follow the instructions given them by the trial judge." *Parker v. Randolph*, supra, 442 U.S. at 73, 99 S.Ct. at 2139, 60 L.Ed.2d 713. *See also id.* at 74 n. 7, 99 S.Ct. at 2140 n. 7, 60 L.Ed.2d 713 ("The 'rule' * * * is that juries can be trusted to follow the trial court's instructions. *Bruton* was an exception * * * created because of the 'devastating' consequences that failure of the jury to disregard a codefendant's inculpatory confession could have to a nonconfessing defendant's case."). The case at bar did not present the type of problems making it an exception to the rule. Rather, the issues confronting the jury were very simple and

the evidence offered against each defendant was equal in both substance and quality to that offered against the other. Additionally, the defenses were not antagonistic. *See State v. Turner*, 141 Ariz. 470, 687 P.2d 1225 (1984). Both defendants maintained that there was no evidence that they were in the house or that they took any actions to start the fire. This also reduced the risk that the jury would be confused by evidence offered by the State to anticipate or rebut a theory by one defendant and not applicable to the other. We, therefore, find that defendant was not denied a fair trial by the court's refusal to sever.

## JURY SELECTION

Defendant raises two objections to the manner in which the jury was chosen. First, he argues that the trial court improperly "death qualified" the jury during the voir dire. Second, he contends that the prosecution impermissibly used his peremptory challenges to remove all the black veniremen.

### 1. Voir Dire

■ During voir dire, the court asked each member of the panel the following series of questions:

If you are selected to sit on this case, you will be instructed that you should not discuss or even consider the possible penalty or sentence that may be imposed in determining whether the defendants are guilty or not guilty. If the defendants were found to be guilty of murder in the first degree by the jury, the court may impose either life imprisonment or the death penalty as a sentence. There are no statutory alternatives. The jury does not determine the sentence. The decision is solely the court's.

Do you have any conscientious or religious scruples or feelings that would prevent you from voting for first degree

---

You must not be prejudiced against one defendant simply because you determine that the state has proved its case against another defendant.

Recommended Arizona Jury Instructions, Instruction 1.02.

murder because of the possible imposition of the death penalty?

Do you feel that you would prefer not to sit on this jury because a first degree murder conviction is possible and does provide for the possibility of the death sentence?

If you are satisfied beyond a reasonable doubt that the defendants are guilty of first degree murder, will it be more difficult for you to vote for conviction knowing that the death penalty is possible than it would be if the death penalty was not possible?

Defendant concedes that because this colloquy was similar to that approved previously by this court, *see State v. Clark,* 126 Ariz. 428, 616 P.2d 888, cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980), he raised no objections at the time. He now asks us, however, to review our position in light of *Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983), which he argues supports his proposition that "the utilization of the death qualification procedure, as to a jury which considers the guilt or innocence of a defendant, is an unconstitutional infringement upon the Defendant's rights under the Sixth Amendment to the United States Constitution." We note first that subsequent to both defendant's trial and the *Grigsby* opinion, we had the opportunity to review this issue. In *State v. Harding,* we affirmed *Clark,* supra, stating "[i]t is proper to inquire whether a prospective juror's attitude concerning the death penalty would prevent him from making an impartial decision." 141 Ariz. 492, 496, 687 P.2d 1247, [No. 5742, filed 30 May 1984, slip op. at 6]. Thus, the *Clark* holding has received recent approval.

In reviewing *Grigsby,* we find no reason to depart from our philosophy. There, the Arkansas District Court was reviewing a situation different from the case at bar. Arkansas has a bifurcated capital procedure, with the same jurors ruling on both guilt and sentencing. There was also a judicially established Arkansas rule that allowed the state to exclude jurors from determining guilt if they stated that they could never impose the death penalty. 569

F.Supp. at 1317. The jurors were never asked whether that would prevent them from viewing the evidence fairly and impartially. *Id.* at 1316.

The *Grigsby* court evaluated this practice under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Winterspoon,* the Supreme Court had reviewed an Illinois statute providing that "[i]n trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." *Id.* at 512, 88 S.Ct. at 1772, 20 L.Ed.2d 779. Illinois also had a bifurcated jury trial, with jurors deciding first guilt and then punishment. The Court found that this statute resulted in an unconstitutional sentencing procedure. The jury meting out the sentence fell "woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments." *Id.* at 518, 88 S.Ct. at 1775, 20 L.Ed.2d 783. The Court limited its holding, however. It stated that there was no evidence that the jury at the guilt phase would view and evaluate the evidence in a manner biased in favor of the prosecution. In *Grigsby,* on the other hand, petitioners had offered a great deal of evidence to prove that "death-qualifying" the jury in this manner would result in a conviction prone jury at the guilt determining phase. *Id.* at 1294–1309. The Court found that this satisfied the evidentiary requirement in Witherspoon and held the practice to be unconstitutional.

The practice in Arizona, as utilized in the case at bar, is significantly different. Here, no one was excused solely because of opposition to the death penalty. Rather, only one juror was excused and that was because he stated that his religious beliefs would prevent him from voting to convict if he knew that imposition of the death penalty was possible. Disqualification when a juror states his inability to be impartial is not only permissible but imperative if the trial judge is to fulfill his responsibility of "ensuring that only jurors who will fairly

and attentively consider the evidence before them are seated * * *." *Commonwealth v. Dickerson*, 372 Mass. 783, 364 N.E.2d 1052, 1059 (1977). *See also Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (implicitly approving a jury selection system similar to our own). We, therefore, affirm our holding in Harding, supra, and find that the voir dire was proper.

2. Peremptory Challenges

 During jury voir dire, the prosecution used three of his peremptory challenges to strike three black veniremen. The defense objected and requested a hearing to determine whether the prosecution had removed these jurors solely because of their race. The trial court denied this request and continued with the selection process. Defendant now argues that the State's actions constituted an impermissible use of peremptory challenges and resulted in denying him his right to a fair and impartial jury.

In 1965, the United States Supreme Court reviewed a similar issue in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The Court held that in order to prove a violation of the equal protection clause of the fourteenth amendment, a defendant must show that black jurors had been systematically excluded from juries over a long period of time. The Court refused to "[require] an examination of the prosecutor's reasons for the exercise of his challenges in any given case." *Id.* at 222, 85 S.Ct. at 837, 13 L.Ed.2d at 773. Such a requirement would be at odds with the purpose of the peremptory challenge, which was to allow a litigant to remove a venireman "without a reason stated, without inquiry and without being subject to the court's control." *Id.* at 220, 85 S.Ct. at 836, 13 L.Ed.2d at 772.

Defendant does not argue that blacks have been systematically excluded. Rather, he states that, in this case, the prosecutor improperly used his peremptory strikes. Defendant recognizes that under *Swain* his claim would fail but maintains that the

*Swain* test is not the proper one, for several reasons.

Defendant relies first upon the sixth amendment. As he notes, at the time *Swain* was decided, the sixth amendment had not yet been applied to the states, requiring the Court to rely upon the fourteenth amendment in its analysis. In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court held for the first time that a defendant's right to a fair and impartial jury was applicable to the states through the due process clause of the fourteenth amendment. In several cases decided subsequently, the Court held that this right meant the right to be tried by an impartial jury drawn from a fair cross-section of the community. *See, e.g., Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 32 L.Ed.2d 83 (1972). *See also McCray v. Abrams*, 576 F.Supp. 1244 (D.C. N.Y.), cert. denied, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983) (Justice Marshall, dissenting). At least one court has reasoned that this repeated emphasis on the cross-section requirement means that the prosecution is no longer free to use its peremptory challenges to exclude an entire ethnic or racial group from the jury room. *McCray v. New York*, 750 F.2d 1113 (2d Cir., 4 Dec. 1984). Defendant asks us to join in this reasoning.

We have reviewed McCray and the authority cited by it and do not find that the sixth amendment mandates the conclusion reached. In *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), the Supreme Court indicated, in dicta, that the Swain rationale was still relevant to sixth amendment analysis. While reviewing defendant's argument that the sixth amendment requires unanimous verdicts before a defendant may be convicted of a felony, the Court stated that:

All that the Constitution forbids, however, is systematic exclusion of identifiable segments of the community from jury panels and from juries ultimately drawn from those panels; a defendant

may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been systematically excluded.

*Id.* at 413, 92 S.Ct. at 1634, 32 L.Ed.2d at 193 (1972). To indicate its continued vitality in sixth amendment jurisprudence, the Court cited *Swain* as support for this proposition. *Id.* The Court re-emphasized this limitation on the sixth amendment's "cross-section" requirement in *Taylor v. Louisiana*, supra. In holding that women could not be excluded from jury panels, the Court indicated that this holding was not intended to reach into the actual composition of the jury. The right to a fair and impartial jury was satisfied as long as "the jury wheels, pools of names, panels, or venires from which juries are drawn [did not] systematically exclude distinctive groups in the community * * *." *Id.*, 419 U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 702. We find no indication that the sixth amendment requires the state court to investigate a prosecutor's reasons for striking individual jurors, absent a showing of systematic exclusion. *See also Hobson v. State,* 471 N.Ed.2d 281, 285–86 (Ind.1984).

Defendant also points to cases in which state courts have relied on their state constitutions to restrict the use of peremptory challenges. *See People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *State v. Neil,* 457 So.2d 481 (Fla. 1984); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.Ed.2d 499, cert denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Kagan,* 101 Misc.2d 274, 420 N.Y.S.2d 987 (1979). In Wheeler, for instance, the California Supreme Court held that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." 148 Cal.Rptr. at 903, 583 P.2d at 761–62. Under the test fashioned by the California Court, there was a presumption that a party was properly exercising its challenge. This presumption could be re-

butted by a three part test that if satisfied would make a prima facie case of discrimination. The burden then "shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone." *Id.* at 906, 583 P.2d at 764–65. These cases have not been immune from attack, however, *see, e.g.,* Saltzburg and Powers, *Peremptory Challenges and the Clash between Impartiality and Group Representation,* 41 Md.L.Rev. 337 (1982); Note, *Criminal Procedure Law,* 55 St. John's L.Rev. 789 (1981), and a number of courts have explicitly rejected the *"Wheeler"* approach and have chosen to continue to follow *Swain. See, e.g., People v. Smith,* 622 P.2d 90 (Colo.App.1980); *Commonwealth v. Henderson,* 497 Pa. 23, 438 A.2d 951 (1981).

We agree with these courts and will interpret defendant's right to a trial by an impartial jury, Ariz. Const. Art. 2 § 24, as co-extensive with the sixth amendment to the United States Constitution. Our reasons for doing so are essentially similar to those given by the Supreme Court in *Swain.* As the Court stated:

> While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of impartiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. * * * It is often exercised upon the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another" * * * or upon the feeling that "the bare questioning [a juror's] indifference may sometimes provoke resentment." * * * It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty.

380 U.S. at 220, 85 S.Ct. at 836, 13 L.Ed.2d at 772 (citations omitted). The Court noted that although peremptory challenges are legislatively created and not constitutionally mandated, the ability to use them is

nonetheless one of the most important rights secured to a litigant. *Id.* at 219, 85 S.Ct. at 835, 13 L.Ed.2d at 771. To subject them to scrutiny "would establish a rule wholly at odds with the peremptory challenge system as we know it." *Id.* at 222, 85 S.Ct. at 837, 13 L.Ed.2d at 774.

We agree with this reasoning. We have stated previously that the peremptory challenge is "an arbitrary and capricious species of challenge to a certain number of jurors without showing bias or prejudice, or any cause." *State v. Lovell,* 97 Ariz. 269, 272, 399 P.2d 674, 676, 677 (1965). This right is substantial rather than merely procedural or technical, *State v. Thompson,* 68 Ariz. 386, 390, 206 P.2d 1037, 1039 (1949), and is extremely valuable. It allows a litigant to ask probing questions concerning bias or prejudice and to challenge a juror for cause knowing that if unsuccessful, he can use one of his strikes to remove that juror. The party need not be concerned about offending a venireman and then being forced to try a case in front of him. Additionally, peremptory challenges are considered useful in allowing parties to select an impartial jury. They are able to eliminate a certain number of jurors who may be objectionable but who may not be shown to be so prejudiced as to be successfully challenged for cause. 47 Am.Jur.2d Jury § 233 n. 9.

Because of the importance of peremptories to both the prosecution and the defense, their use should not be impaired or infringed upon. Subjecting a prosecutor's, or defendant's, strikes to judicial scrutiny in the manner suggested by defendant would do just that. Requiring either party to explain why it had removed certain jurors and then evaluating whether the reason was adequate and permissible would essentially transform this right to be arbitrary and capricious into the requirement that the challenge be only for cause. Additionally, judicial scrutiny would inhibit the types of questions asked on voir dire. As one commentator has pointed out, "[i]n attempting to establish the specific bias required for a challenge for cause, the prosecutor may not want to risk antagonizing a member of a racial group if he knows that the court could void his peremptory challenge of that individual on the basis that the challenge was exercised out of group bias." Note, *People v. Payne and the Prosecution's Peremptory Challenges: Will They be Preempted?* 32 De Paul L.Rev. 399, 422 (1983).

We remind the state that the duty of the prosecution is to seek justice, not merely to convict. *ABA Standards for Criminal Justice* § 3–1.1 (2d ed. 1982). It is entitled, therefore, not to a jury biased in its favor but to one that will view the evidence fairly and impartially. *Cf. Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). It should use its peremptory challenges toward this end. In view of the potential harm to this extremely important right, however, we will not look behind the removal of jurors to the prosecutors' reasons for striking them. Rather, we will continue to adhere to the Swain rationale that a defendant is not entitled to a new trial unless he is able to show systematic exclusion of an identifiable group. Because defendant has made no such showing, we find no error.

## LOSS OF EVIDENCE

 Defendant argues that he was deprived of a fair trial due to the destruction of evidence. After the fire, and after the initial on-premises inspection, the deputy placed the mattress and the blankets and sheets that lay on top of the bed outside the house to avoid a possible rekindling. The mattress was never moved back into the house and the bedding was subsequently lost. Defendant now argues that this action was a loss and destruction of certain evidence and constituted a violation of his due process rights. Alternatively, he contends that, pursuant to *State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964), he was entitled to the following instruction:

> If you find that the Plaintiff, the State of Arizona, has destroyed any evidence whose contents or quality are in issue,

you may infer that the true fact is against their interest.

Defendant argues that failure to give this instruction constituted reversible error. We do not agree with either argument.

In reviewing whether a defendant has been denied a fair trial due to the destruction of evidence, we must look to the circumstances of each particular case. *State v. Nelson*, 129 Ariz. 582, 585, 633 P.2d 391, 394 (1981). We have also stated that we will reverse a criminal conviction if defendant can demonstrate bad faith or connivance on the part of the state or that he was prejudiced by the loss of evidence. *State v. Hannah*, 120 Ariz. 1, 2, 583 P.2d 888, 889 (1978).

In the instant case, defendant offered no evidence that would prove bad faith or connivance, nor can we find any. It was certainly not unreasonable for the officers to move the mattress and bedding outside. Deputy Martin, a fire expert, testified that he had moved the mattress outside so that there would be no chance of it rekindling and doing further damage to the house. Additionally, the officers took pictures of the bed prior to moving it, thus preserving as much as was possible, without threatening the safety of the house. The officers also took samples from the bed at that time, and tests were performed on materials not altered from being placed outside. Although the officers could perhaps have been more careful in preserving the mattress, we cannot say that these actions rose to the level of bad faith.

Furthermore, defendant has failed to prove that he was prejudiced by this negligence. Defendant claims that *State v. Hannah*, supra, requires dismissal of the indictment. We do not agree. In *Hannah*, the police destroyed certain items of evidence before they could be examined. We said:

> Because tests were not made which could have been made, and because it cannot now be determined whether exculpatory evidence would have been developed, we think that the trial court could conclude that [defendant] had been de-

nied due process by the negligent destruction of the seized evidence.

*Id.* at 2, 583 P.2d at 889. Here, tests were performed on the mattress and those materials found on top of it to determine both the composition and whether accelerants were used. Defendant does not allege that these tests were unreliable or performed in a negligent manner, *State v. Schilleman*, 125 Ariz. 294, 299, 609 P.2d 564, 569 (1980). Furthermore, the samples used for testing were retained and were, therefore, available for defendant's use. *See* Rule 15.1(c), Arizona Rules of Criminal Procedure, 17 A.R.S. Defendant further argues that because the electric blankets were lost, he was unable to determine whether they were the cause of the fire. Defendant's own expert admitted, however, that it was unlikely that the electric blanket caused the fire. He had been able to examine the switch, which was in the off position indicating that the blanket had not been on and, therefore, had not caused the fire. Any further questions, such as whether the switch was defective, could have been easily resolved by opening the mechanism and examining it. We are, therefore, unable to find that defendant was prejudiced by the State's actions.

Defendant alternatively suggests that he was entitled to a Willits instruction. To be entitled to such an instruction, an accused must show that had the evidence not been destroyed, it might have tended to exonerate him. *State v. Hunter*, 136 Ariz. 45, 51, 664 P.2d 195, 201 (1983). Whether he has adequately demonstrated this is a question for the trial court which will not be reversed absent an abuse of discretion. *State v. Lamb*, 142 Ariz. 463, 473, 690 P.2d 764, 774 (1984). Again, because defendant was unable to show that he had been prejudiced by loss of the evidence, we do not find that the trial court abused its discretion.

## SUFFICIENT EVIDENCE OF GUILT

Defendant next argues that the trial court should have granted his motion, made at the end of the State's case, for a

Judgment of Acquittal pursuant to Rule 20, Arizona Rules of Criminal Procedure, 17 A.R.S. Defendant contends that the state failed to prove that he knew or should have known that the lamp was between the mattress and the box springs. He further argues that the state failed to prove that he had acted as an accomplice in the underlying crimes. We do not agree.

We have stated that a Rule 20 motion for judgment will be granted only when there is "no substantial evidence to warrant a conviction." *State v. Clabourne*, 142 Ariz. 335, 345, 690 P.2d 54, 64 (1984). Substantial evidence may be either circumstantial or direct. *See State v. Carriger*, 123 Ariz. 335, 339, 599 P.2d 788, 792, cert. denied, 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1979). We have defined circumstantial evidence as "the assertion of a witness as to the existence of some fact from which the existence of the thing in issue may be reasonably and logically inferred." *State v. Thompson*, 101 Ariz. 38, 39, 415 P.2d 566, 567 (1966). Finally, we will reverse the trial court's decision not to grant the Rule 20 motion only where there is a complete absence of probative facts to support the conclusion. *State v. Doty*, 110 Ariz. 348, 349, 519 P.2d 47, 48 (1974).

In the present case, there was sufficient evidence to support the conclusion that defendant knew or should have known that the lamp was underneath the mattress. First, there was no dispute that the lamp was between the bed and the box spring. Second, the jury heard evidence that the lamp would have had to have been placed there. William Martin, a fire investigator testifying for the prosecution, stated that in his opinion the lamp could not have gotten into that position accidentally. The jury also heard testimony from Courtney Brown that defendant was in the victim's house. This presented sufficient circumstantial evidence to allow the jury to find that defendant had either placed the lamp there or was aware of its existence.

There was also evidence sufficient to support a finding that defendant had acted as an accomplice. "[T]o prove accomplice liability, the State must show that [defendant] participated or aided the planning or commission of the crime * * *." *State v. Hickle*, 133 Ariz. 234, 238, 650 P.2d 1216, 1220 (1982). The jury heard testimony that defendant and Lawson had decided together to follow the victim to his home. Courtney Brown stated that they drove to his house and both men got out of the car. They took the sash from her robe. When they returned to the car fifteen minutes later, they were carrying something and had some money and a six pack of the same brand of beer that the victim had bought at the grocery store. The jury also heard testimony that when the victim's body was discovered, his hands and feet were tied with the same type of material as Ms. Brown's belt. We find that this evidence was sufficient to allow the jury to find that defendant had, at the least, aided the co-defendant in the underlying crimes of kidnapping, burglary and robbery. A.R.S. §§ 13–303, –1304, –1507, –1902.

## JURY INSTRUCTION

At trial, the judge gave the following instruction concerning felony murder:

The crime of first degree murder requires proof of the following two things:

(1) The defendant, acting either alone or with one or more persons, committed or attempted to commit kidnapping, burglary or robbery; and

(2) In the course of and in furtherance of the crime, the defendant or another person caused the death of any person.

In order to find the defendants guilty of first degree murder, you must find that the death was proximately caused by the acts of the defendants.

The proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred.

Proximate cause does not exist if the chain of natural effects and cause either does not exist or is broken by intervening

events which were unforeseeable by the defendants.

Conduct is the cause of a result when both of the following exist:

(1) But for the conduct, the result in question would not have occurred.

(2) The relationship between the conduct and results satisfies any additional causal requirement imposed by the statute defining the offense.

The trial court refused to give defendant's requested charge:

A coincidence exists when the defendant merely puts the victim at a certain place at a certain time and because the victim was so located it was possible for him to be acted upon by the intervening cause. When a coincidence exists as an intervening cause, and the coincidence was unforeseeable by the defendants then there is no proximate cause and the defendants must be found not guilty of homicide.

Defendant now contends that failure to give his requested charge was in error and that the instructions given were ambiguous, conflicting and incomplete.

Defendant bases his argument, in part, on what he terms the state's misunderstanding of the law of proximate cause. Defendant states that "[i]t was clear from the outset that the State was going to argue that 'but for' the Defendant's alleged conduct of tying Mr. Bayne up, the death would not have occurred." This misstatement, he argues, created confusion on the part of the jury. We do not agree. After both sides had presented evidence but before closing argument, the judge had a conference with both attorneys to discuss jury instructions. At that time, the prosecution explicitly stated that it would not argue that tying the victim up by itself was the proximate cause of his death. Additionally, the state told the jury that, in order to convict defendant of felony murder, the jury would have to find that defendant placed or left a lamp under the mattress causing a fire. We find that this explanation satisfied the legal requirement of proximate causation, namely that defendant's action "in a natural and continu-

ous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Black's Law Dictionary*, 1103 (Rev.5th Ed.1979). Accordingly, we do not believe that the jury was misled by the prosecutor's statements.

We also find nothing improper with the judge's instructions. The sections regarding causation and felony murder were taken almost directly from the statutes, *see* §§ 13–203, –1105(A)(2), and were proper statements of the law. *State v. Woratzek*, 134 Ariz. 452, 456, 657 P.2d 865, 869 (1982). Additionally, the explanation of proximate cause was essentially the standard definition. *See Black's, supra.*

As to the judge's refusal to give defendant's instruction, a trial court is not required to give a proposed instruction when it is adequately covered by other instructions. *State v. De Nistor*, 143 Ariz. 407, 414, 694 P.2d 237, 244 (1985). As defendant concedes, coincidence is a factor in analyzing proximate cause. It goes essentially to the issue of intervening cause, *i.e.* did defendant's actions merely place the victim in a situation where other, wholly unrelated (coincidental) factors acted on him such that defendant could not be held accountable for his death? Thus, by instructing the jury that proximate cause did not exist if death was caused by intervening, unforeseeable factors, the judge adequately covered the theory embodied in defendant's requested instruction. We find no error.

## FELONY MURDER

██ Defendant next argues that giving the jury instructions concerning kidnapping, robbery and burglary as well as felony murder violates the Double Jeopardy Clause. U.S. Const.Amend. V; Ariz. Const. Art. 2, § 10. Defendant states that *Pryor v. Rose*, 699 F.2d 287, vacated, 699 F.2d 298 (6th Cir.1983), *affirmed*, 724 F.2d 525 (1984), holds that "a judge must simply not give a felony murder instruction when it is possible to also have a conviction for an underlying felony." 699 F.2d at 292.

He asks us to follow his reasoning and reverse his conviction.

We do not find Pryor dispositive of this issue. The Sixth Circuit was not concerned with a conviction for both felony murder and the underlying felony. Rather, defendant was indicted for assault with intent to commit robbery with a deadly weapon and assault with intent to commit first degree murder. For assault with intent to commit robbery, the state had to prove: (1) intent to commit robbery and (2) an overt act involving the use of a deadly weapon. In order to prove assault with intent to commit first degree murder, the state would normally have to prove (1) intent to commit a wilful, deliberate, malicious and premeditated killing and (2) an overt act involving the use of a deadly weapon. *See* Pryor, 724 F.2d at 530. The trial court, however, had instructed the jury that intent to commit first degree murder encompassed both premeditated murder and felony murder. Under that instruction, intent to commit murder could be supplied by finding an intent to commit robbery. As a result, defendant could have been twice convicted and sentenced consecutively to exactly the same crime. In absence of clear legislative language that this was the intended result, the Court of Appeals found that this result violated the Double Jeopardy Clause. *Id.*

Because we find Pryor inapplicable, we will continue to rely on our earlier holdings that conviction and sentence for both felony murder and the underlying felony is constitutionally permissible. *State v. Gerlaugh*, 134 Ariz. 164, 170, 654 P.2d 800, 806 (1982).

## FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSES

■ In Count I of the indictment, defendant was charged with both felony murder, A.R.S. § 13–1105(A)(2), and premeditated murder, § 13–1105(A)(1). At the close of the state's case, the trial court stated that it would give an instruction on felony murder but not on premeditation. Because the court had dismissed the premeditation charge, it subsequently refused

defendant's request to instruct on the lesser included offenses: manslaughter, second degree murder and negligent homicide. Defendant now contends that this failure constitutes reversible error. He maintains that, in an effort to rebut the charge of premeditation, he elicited information from the state's witnesses tending to show a lesser state of mind. Defendant argues that, under *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315 (1981), he was entitled to a lesser included offense instruction. We do not agree.

We note first the anomaly in this assignment of error. Defendant requested and was granted, in part, dismissal of certain charges, thereby reducing his potential liability. He now argues that failing to allow the jury to convict him of additional offenses is in error.

We do not find *Vickers, supra,* to be controlling. There the premeditation count had not been dismissed and the trial court had failed to instruct on the lesser included offenses. Here, the premeditation charge had been dismissed. Without the "greater charge" there are no lesser included offenses. Requiring the trial court to instruct on lesser included offenses when the greater charge has been dismissed is at odds with the purpose behind the lesser included offense doctrine. As the Supreme Court has explained, "[the doctrine] affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal." *Beck v. Alabama*, 447 U.S. 625, 634, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392, 400 (1980).

True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the de-

fendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.

*Keeble v. United States,* 412 U.S. 205, 212, 93 S.Ct. 1993, 1997, 36 L.Ed.2d 844, 850 (1973). Here, however, the jury was not faced with the choice between conviction and acquittal. There was simply no other charge upon which to convict. As a result, defendant was not in need of this "third option" of convicting on a lesser included offense to ensure that he was accorded full benefit of the reasonable doubt standard. *Beck,* supra, 447 U.S. at 634, 100 S.Ct. at 2388, 65 L.Ed.2d at 400. Accordingly, we hold that where a charge has been dismissed, a defendant is not entitled to have the jury instructed on the lesser included offenses of that charge. We find no error.

We have searched the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969), and find none.

The conviction, judgment, and sentence of defendant are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, J., concur.

FELDMAN, Justice, specially concurring.

I cannot agree with the portion of the opinion upholding the use of peremptory challenges to remove all blacks from the jury panel.

Defendant contends that the sixth amendment guarantee of an "impartial jury" requires that there be a fair chance that the trial jury reflect a cross-section of the community, so "that the prosecution is no longer free to use its peremptory challenges to exclude an entire ethnic or racial group from the jury room." *Ante,* at 1254.

The majority holds that it "[does] not find that the Sixth Amendment mandates the conclusion...." *Id.* In reaching this result, the majority finds that the sixth amendment is violated only by a *"systematic exclusion* of an identifiable group." *Ante,* at 1256 (emphasis supplied).

Of course, since the majority also holds that it "will not look behind the removal of jurors to the prosecutors' reasons for striking them," (*ante,* at 1256), the prohibition against systematic exclusion refers not to the "system" used in the particular case under consideration, but instead to a "system" used in some unspecified number of prior cases. If exclusion of minorities violates the sixth amendment guarantee of a fair trial, it is difficult to understand why the violation occurs only when this defendant can show that the state has also violated the Constitution in other cases. The majority does not deal with this question.

In speaking of the sixth amendment guarantee of "an impartial jury" (and the identical guarantee in art. 2, § 24 of the Arizona Constitution), the majority admonishes the prosecution that its duty is to "seek justice, not merely to convict," so that it should use its peremptory challenges to obtain not "a jury biased in its favor" but only one that will "view the evidence fairly and impartially." *Ante,* at 1256. The effect of these splendid words is immediately diminished, if not eviscerated, by the court's holding that it "will not look behind the removal of jurors [by the use of peremptory challenges] to the prosecutors' reasons for striking them." *Id.* This, of course, allows the prosecutor to do exactly what was done in the case at bench—use peremptory challenges to remove all blacks from a jury panel, purposefully insuring that a black defendant will be tried by an all white jury.[1]

---

1. At oral argument, the state conceded that at least one, if not all, of the black jurors struck by use of the peremptory challenges in this case had served as jurors before, had not been challenged by the state in cases where the defendant was white, and had voted for the state in cases in which they had served. There was nothing in the record to suggest any reason that the black members of the venire would not have fulfilled the state's expectations of fairness and impartiality. Since the trial court refused defendant's request for a hearing on the issue, and since the prosecutor did not volunteer any reason which might have prompted the use of the peremptory

While the majority purports to follow the precedent of the United States Supreme Court in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), its language goes far beyond the holding in *Swain* and gives the state and its agents *carte blanche* to use peremptory challenges for purposes which *Swain* holds constitutionally impermissible. *Swain,* in fact, is a fourteenth amendment case and cannot be used to support the court's sixth amendment analysis. *Swain* was decided before the sixth amendment guarantee of an impartial jury was applied to the states. Although the majority recognizes this, it states that *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) give *Swain* "continued vitality in Sixth Amendment jurisprudence" *Ante,* at 1255. That argument must fall before the recent memorandum decision of the United States Supreme Court in the consolidated cases of *McCray v. New York, Miller v. Illinois,* and *Perry v. Louisiana,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983).

In these cases the Court considered three state decisions affirming convictions where juries had allegedly been racially culled by use of peremptory challenges. Although certiorari was denied, five justices spoke to the issue of whether a prosecutor's use of the peremptory challenge to exclude all blacks because of their race infringed on the sixth amendment right to an impartial jury. Justices Marshall and Brennan noted that the guarantee of "an impartial jury" had already been construed to encompass the requirement that the jury represent a "fair cross-section" of the community and that the exclusion of a particular race from jury service simply "because of their race 'contravenes the very idea of a jury [as] a body truly representative of the community....'" *McCray v. New York,* 461 U.S.

at 967, 103 S.Ct. at 2442 (quoting *Taylor v. Louisiana,* 419 U.S. at 528, 95 S.Ct. at 696.) Therefore, Justices Marshall and Brennan dissented from the denial of certiorari, stating that they would grant the writ to re-examine *Swain* in light of sixth amendment principles. *Id.,* 103 S.Ct. at 2443. Justices Stevens, Blackmun and Powell had joined in the vote to deny certiorari, but explained in a separate opinion that they did not disagree with Justice Marshall's "appraisal of the importance of the underlying issue." *Id.* at 2438. These justices acknowledged the trend of state court decisions contrary to *Swain,* and concluded that:

> ... It is a sound exercise of discretion for the [U.S. Supreme] Court to allow the various States to serve as laboratories in which the issue receives further study before it is addressed by this court.

*Id.* at 2439.

Thus, it is an open question whether *Swain* has any application to a sixth amendment analysis of the guarantee of an impartial jury, and the majority statement (*ante,* at 1255) that it will interpret the Arizona guarantee as co-extensive with the sixth amendment is premature to say the least. We have been invited by five members of the United States Supreme Court to make an independent analysis of the discriminatory use of peremptory challenges. That analysis could serve to illuminate the issues that, according to five members of the Court, have *not* been foreclosed by *Swain.*

The courts that have undertaken the type of analysis invited by the United States Supreme Court have yet to reach the conclusion offered by the majority of this court. Courts in California, Massachusetts, New Mexico, and Florida have acknowledged that the right to an "impartial jury" includes the right to a jury drawn from a fair cross-section of the community.

on each of the black members on the venire, the state also conceded at oral argument that, for purposes of this appeal, we must assume that the use of the peremptory challenges in this case was racially motivated. I believe it would not be illogical to infer that, in the future, other

prosecutors, operating under similar assumptions and the sanction of the majority opinion, may decide to use peremptory challenges to insure that Hispanics be tried by all Anglo juries, Jews by all Christian jurors, women by male jurors, and the like.

Thus, they hold that the constitutional guarantee is violated by the use of peremptory challenges for the sole purpose of removing from the trial jury all persons who belong to the same cognizable group or minority as the defendant. *See People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *State v. Crespin*, 94 N.M. 486, 612 P.2d 716 (App.1980); *State v. Neil*, 457 So.2d 481 (Fla.1984); *see* also *McCray v. Abrams*, 750 F.2d 1113 (2d Cir. 1984). These courts all conclude that:

> If there is a Sixth Amendment requirement that the venire [panel] represent a fair cross section of the community, it must logically be because it is important that the defendant have the change that the petit jury will be similarly constituted. The necessary implication is that the Sixth Amendment guarantees the defendant that possibility. It guarantees not that the possibility will ripen into actuality, but only the fair and undistorted chance that it will. We thus agree that the Sixth Amendment does not require any action to insure that the representative character of the venire be carried over to the petit jury; we think the [Sixth] Amendment simply prohibits the state's systematic elimination of the possibility of such a carry-over.

*Id.* at 1128–29. To the Second Circuit, and to the state courts just cited, "systematic elimination" does not mean that there is no constitutional violation in a particular case unless there have also been constitutional violations in other cases. Such a standard, of course, makes no sense whatsoever. The constitutional guarantee makes sense only if it is construed to mean that the state may not use its peremptories in any particular case systematically to strike jurors on the sole basis of affiliation with a cognizable group or minority.

> Thus, [the Sixth] Amendment protects each defendant who is to stand trial, not simply the last in a sequence of defendants to suffer the deprivation of an impartial jury. Accordingly, we construe

the Sixth Amendment's provision to require the court to decide each case on the basis of the acts or practices complained of in that very case, and not to require the defendant to show, as *Swain* requires for an equal protection claim, that those acts or practices have had undesirable effects in case after case. We confess that we are not sure why the Equal Protection Clause should protect only the last of a number of defendants to be subjected to discrimination, but we are sure that it is not sound to extend that proposition to the interpretation of a constitutional provision that is expressly directed to "all" criminal prosecutions.

> Accordingly, we conclude that a defendant may appropriately subject to scrutiny under the Sixth Amendment the prosecution's use of its peremptory challenges on the basis of its actions in his own particular case.

*Id.* at 1130–31.

I believe, further, that the majority has seriously misread *Swain*. That case does not hold, as the majority implies, that the use of peremptory challenges to exclude jurors on racial grounds is permissible unless it has occurred in a number of prior cases. Rather, it admonishes us that

> [f]or racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution ... but is at war with our basic concepts of a democratic society and a representative government.

*Swain v. Alabama*, 380 U.S. at 204, 85 S.Ct. at 827 (quoting *Smith v. State of Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940)). Also important is the following precept:

> Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race.

*Id.* (quoting *Cassell v. State of Texas*, 339 U.S. 282, 286, 70 S.Ct. 629, 631, 94 L.Ed. 839 (1950)). Finally, *Swain* states that these principles are applicable to all groups:

Nor is the constitutional command forbidding intentional exclusion limited to Negroes. It applies to any identifiable group in the community which may be the subject of prejudice.

*Id.*, 308 U.S. at 204–05, 85 S.Ct. at 827 (citing *Hernandez v. State of Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954)).

These principles established in *Swain* and the cases which preceded it do not lend themselves to the conclusion that the state may cull the jury in any particular case and that the Constitution is violated only when it can be shown the state has done so in other cases. The requirement for a showing of systematic exclusion in *Swain* is an evidentiary matter, not a substantive grant of permission for isolated constitutional violation. The court decided that a showing of the state's exclusion of blacks from a particular trial jury would not establish that the exclusion had been accomplished for the constitutionally impermissible reason of racial discrimination. *Swain* simply holds that there will be a presumption that the prosecution has used its peremptory challenges for a permissible reason or set of reasons—anything case oriented, rather than race-oriented. It goes on to state:

> We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved, and the particular crime charged ... [However, if] the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory

challenge is not designed to facilitate or justify.

*Id.*, 308 U.S. at 223–24, 85 S.Ct. at 837–38.

Thus, *Swain* does not establish a substantive prosecutorial right to use peremptory challenges to achieve unconstitutional goals. It actually states that such a use would be constitutionally incorrect. It simply establishes a presumption of proper use which can be overcome only on a showing of systematic exclusion. There is no need to apply that evidentiary rule, created under a fourteenth amendment analysis, to a sixth amendment guarantee that is applicable to "all" criminal trials. In fact, the evidentiary rule established by *Swain* "has been the subject of almost universal and often scathing criticism." *McCray v. New York*, 103 S.Ct. at 2440 (opinion of Marshall, J.); *State v. Crespin, supra.* We need not create presumptions to disguise facts. The evidentiary rule created in *Swain*'s equal protection analysis has done just that because it has created an insurmountable barrier for defendants. *McCray v. Abrams*, 750 F.2d at 1120–22. The very nature of the peremptory, the lack of records of group affiliation and the absence of record on use of peremptory challenge make it almost impossible to prove what occurred in other cases. *Id.*

The majority overlooks, also, the dimensions of the injustice accomplished by improper use of peremptories. The injustice is not primarily visited upon the defendant. I concur today because I do not believe this defendant was personally prejudiced by the removal of the three black jurors from the panel. I do not accept the assumption (evidently made by the prosecutor in the case at bench) that all members of a particular race will be biased. I have no doubt that the white members of this jury were able to judge the evidence fairly and impartially. That evidence shows this defendant's guilt beyond any doubt, and I write this concurrence only because I believe it necessary to establish a more important rule. The injustice done here is not to the defendant, but to the state, its citizens, and its system of justice. The decisions of our courts are not

enforced by military law or special police. The measure of the success of such a judicial system is the degree to which our people obey the unenforceable. Our system of justice functions because our citizens respect our courts, believing that justice is administered impartially and without thought to race, religion, ethnic origin, gender, or political belief. That belief is fostered only if justice is administered with an even hand. Thus, the proper functioning of the jury system depends upon three factors. The first is that the jury be representative of the entire community and not the "organ" of any special race, group, or class. *Glasser v. United States*, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942). The second is that there be no wholesale exclusion of a group or class from the jury, because this would deprive the system of the "insights" and consensus of all segments of the community. *Peters v. Kiff*, 407 U.S. 493, 510–11, 92 S.Ct. 2163, 2172, 33 L.Ed.2d 83 (1972) (Burger, C.J., dissenting). The "common-sense judgment of the jury ... is surely enriched when all voices can be heard." *Id.* The third factor is that it *appear* that justice is impartially administered.[2]

Thus, the damage done by enshrining the prosecution's right to use peremptory challenges in a constitutionally impermissible manner is not necessarily a damage done to the defendant. Rather, it is an

> injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.

*Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946).

In the eyes of minority groups, trial by racially selected juries is simply a demonstration of law being imposed on them by some more powerful group rather than by the participation of all in a common system. It is unavoidable in a country of immigrants that there be a number of minority groups and that there be frictions between them. It has been the genius of America to devise methods of melding minorities into one nation. The majority's application of the *Swain* rule to the sixth amendment right to jury trial is not a step forward in this process; it is rather, a step toward balkanizing America. Thus, having been given leave by a majority of the United States Supreme Court to follow either of two interpretations of the sixth amendment guarantee of an impartial jury, I would adopt that which prohibits the state or its agents from using unconstitutional modes of jury selection in *any* case. In any event, I would choose that interpretation for our state constitution. If it were a question of choosing between the preservation of constitutional right and preservation of the venerated tradition of unfettered challenges, I would stand on the constitution and let tradition bend or give way. I believe, however, that no such choice need be made.

The majority fears that subjecting the use of the peremptory challenge to scrutiny by the trial judge would deprive the state of advantages enjoyed by the defendant and by private litigants. *Ante*, at 1255–1256. In general, I agree that the state, like private parties, should be free to use peremptories for any reason, but I do not believe the principle permits the state to use peremptory challenges for those reasons which the constitution forbids to the state. The constitution leaves private citizens free to discriminate, but does not confer that privilege upon the state. The assumption that no black is qualified to sit on a jury which will hear a case involving a black defendant is a discriminatory assumption that black people are not as qualified to be fair and impartial judges of evidence as others. The idea that white persons can be objective in deciding a case on its merits even though the defendant is white, but that black people can not when the defendant is black, is the essence of bigotry, for it assumes that all blacks are less objective than whites. The constitu-

---

**2.** The prohibition against appearances of impropriety is one which governs much of our system of justice. The majority ignores it here, where it is most important.

tion forbids the state from holding such ideas or, worse, putting them into effect.

The majority argues that supervision of the state's use of peremptory challenges would disrupt criminal trials, destroy the use of peremptories, or subject prosecutors to unseemly or lengthy questioning with respect to their reasons for challenge. Other states, however, have been following a rule requiring some judicial supervision of challenges without destroying the criminal justice system. Furthermore, in most cases experienced trial judges are well able to understand the reasons that peremptory challenges are used to strike particular jurors. Those reasons are apparent from voir dire examination, from the jurors' background, from the fact that the prosecutor has unsuccessfully sought to challenge for cause, or for a variety of reasons that prompt the use of the peremptory. The trial judge need interfere only when he suspects (either because of objection or by his own observation) that the prosecutor has embarked upon a systematic use of the peremptory challenge to remove every member of the panel who belongs to the same minority group, and when there is no other apparent reason for such use of the peremptory challenge. The interference, even then, need only be minimal. It is surely not too much to ask the trial judge to inquire at a bench conference whether the prosecutor has any reason, other than that which is constitutionally impermissible, for his exercise of the peremptory. And it is surely not too much to ask the prosecutor to give the trial judge some insight.

I realize full well that the occasional unscrupulous advocate may invent explanations to cover up the impermissible reason for his challenge. No great harm to the defendant will have been done in such cases. But a great deal will have been done towards establishing the proper rule of law—that the state's system of justice is not blind to reality, but only to the race, religion, ethnic origin, or gender of the person before it. That principle is not established by hortatory admonitions that the state should "seek to do justice" but courts will not scrutinize what it actually does in the process. The law should clearly state that Constitutional principle requires the state to refrain from discrimination and that the courts will do what they can to require the state's agents to obey the law.